## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**R. ALEXANDER ACOSTA**, Secretary of Labor,   :
United States Department of Labor,           :
                                   :
                 Plaintiff,        :     CIVIL ACTION
                                   :
       v.                          :     Case No.  17-cv-00541
                                   :
**MACY'S, INC., ANTHEM BLUE CROSS**    :
**LIFE AND HEALTH INSURANCE**         :
**COMPANY, CONNECTICUT GENERAL LIFE**:
**INSURANCE COMPANY,** and the          :
**MACY'S, INC. WELFARE BENEFITS PLAN,**  :
                                   :
              Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## <u>COMPLAINT</u>

Plaintiff R. Alexander Acosta, Secretary of Labor, United States Department of Labor ("Secretary"), alleges as follows:

1.     This action arises under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.*, and is brought by the Secretary under ERISA § 502(a)(2) and (5), 29 U.S.C. § 1132(a)(2) and (5), to enjoin acts and practices that violate the provisions of Title I of ERISA, to obtain appropriate equitable relief for breaches of fiduciary duty under ERISA § 409, 29 U.S.C. § 1109, and to obtain such further equitable relief as may be appropriate to redress violations and to enforce the provisions of Title I of ERISA.

2.     This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

3.      Venue lies in the Southern District of Ohio, Western Division, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Health Plan is administered in Cincinnati, Hamilton County, Ohio, within this district.

**DEFENDANTS AND PARTIES IN INTEREST UNDER ERISA**

4.      Macy's, Inc. Welfare Benefits Plan ("Plan" or "Health Plan") is an employee benefit plan within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA § 4(a), 29 U.S.C. § 1003(a).[1]

5.      From July 1, 2008, through the present, Defendant Macy's, Inc. ("Macy's"), was a Delaware corporation that maintained its principal place of business in Cincinnati, Ohio.

6.      The Health Plan was established on April 1, 1968, to provide eligible employees and retirees of Macy's with health care benefits under various insured options and self-funded options.

7.      Participation in the Health Plan was reserved for Macy's eligible employees, retirees, and their dependents.

8.      From July 1, 2008, through the present, Macy's was the plan administrator of the Health Plan; exercised discretionary authority and discretionary control respecting management of the Health Plan; exercised authority and control over disposition of the Health Plan's assets; had discretionary authority and discretionary responsibility in the administration of the Health Plan; and was a fiduciary of the Health Plan within the meaning of ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii).

---

[1] The Health Plan is named as a defendant herein pursuant to Federal Rule of Civil Procedure 19(a) solely to assure that complete relief can be granted.

2

9.      From July 1, 2008, through the present, as an employer of employees covered by the Health Plan and a fiduciary to the Health Plan, Macy's was a party in interest to the Health Plan within the meaning of ERISA § 3(14)(A) and (C), 29 U.S.C. § 1002(14)(A) and (C).

10.      From at least July 1, 2008, through June 30, 2012, Macy's contracted with Anthem Blue Cross Life and Health Insurance Company ("Anthem") to provide claims adjudication services to the self-funded portion of the Health Plan for in-network and out-of-network claims.

11.      From at least July 1, 2008, through June 30, 2012, Anthem exercised discretionary authority and discretionary control respecting management of the Health Plan; exercised authority and control over disposition of the Health Plan's assets; had discretionary authority and discretionary responsibility in the administration of the Health Plan; and was a fiduciary of the Health Plan within the meaning of ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii).

12.      From at least July 1, 2008, through June 30, 2012, Macy's contracted with Connecticut General Life Insurance Company ("Cigna") to provide claims adjudication services to the self-funded portion of the Health Plan for in-network and out-of-network claims.

13.      From at least July 1, 2008, through June 30, 2012, Cigna exercised discretionary authority and discretionary control respecting management of the Health Plan; exercised authority and control over disposition of the Health Plan's assets; had discretionary authority and discretionary responsibility in the administration of the Health Plan; and was a fiduciary of the Health Plan within the meaning of ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii).

## GENERAL ALLEGATIONS

14.    From July 1, 2008, through June 30, 2012, Macy's used its Summary Plan Description and Summary Plan Description Addenda as governing Health Plan Documents.

15.    From July 1, 2008, through June 30, 2012, the Health Plan was also governed, in part, by the "Federated Department Stores, Inc. Welfare Benefits Plan (No. 941)" (signed Dec. 22, 2000), which states that amendments to or terminations of the Health Plan, "[S]hall be in the form of a written action approved by the Chief Executive Officer, or any officer of the Company to whom he delegates such authority as he deems appropriate, and shall be effective on the date stated in such written action.  Any documents implementing the amendment or termination may be executed by any officer of the Company, or such other person given the authority by the Chief Executive Officer."

16.    Exhibit A of the "Federated Department Stores, Inc. Welfare Benefits Plan (No. 941)" (signed Dec. 22, 2000) also states that the component benefits provided by the Health Plan "are described in various insurance contracts, summary plan descriptions, and other documents, as in effect from time to time."

17.    The Health Plan's health care benefits were partly self-funded and partly insured.

18.    The Health Plan's expenses were funded by employee, employer, and COBRA contributions.

19.    The contributions for the self-funded benefits were forwarded to a Health Plan trust account to be used to pay approved Health Plan claims and administrative expenses of the Health Plan.

20.    The contributions for the fully-insured benefits were forwarded to insurance companies to obtain health plan coverage to pay Health Plan claims.

21.     For the self-funded portion of the Health Plan, Macy's determined which reimbursement methodologies were used to determine and pay approved, out-of-network claims.

22.     The only documents governing the Health Plan where Macy's identified which method would be used to determine the reimbursement rates for out-of-network claims were the Summary Plan Description Addenda.

23.     For the self-funded portion of the Health Plan, Macy's contracted with third-party claims administrators Cigna and Anthem to determine and pay Health Plan claims.

24.     From at least July 1, 2008, through June 30, 2012, the Summary Plan Description Addenda described the out-of-network claim reimbursement methodology to be used by Cigna and Anthem to make claim determinations for the Health Plan's self-funded arrangements.

25.     Macy's reviewed and approved all amendments of the Health Plan documents, including the Summary Plan Description Addenda.

26.     From at least July 1, 2011, through the present, Macy's included a wellness program in the Health Plan.

27.     From at least July 1, 2011, through the present, the Health Plan's wellness program included a tobacco surcharge (the "Tobacco Surcharge") for employees enrolled in company-sponsored medical coverage who have used tobacco products within the last consecutive six months or have participating dependents who have used tobacco products within the last consecutive six months (the "Tobacco Surcharge Wellness Program").

28.     From July 1, 2011, through the present, Macy's provided Health Plan participants free access to tobacco cessation programs administered by either Cigna or Aetna, depending on the period.

29.     From July 1, 2011, through the present, Cigna administered the "Quit Today!" and "CareAllies" tobacco cessation programs on Macy's behalf.

30.     From July 1, 2012, through the June 30, 2015, Aetna administered various tobacco cessation programs on Macy's behalf, including "Breathe," " Journeys – Be Tobacco Free," [2] and "Healthy Lifestyle Coaching."

31.     From at least July 1, 2011, through the present, Macy's solely controlled the Tobacco Surcharge Wellness Program, including:

a.      Determining which participants are charged the Tobacco Surcharge;

b.      Determining which participants are reimbursed the Tobacco Surcharge;

c.      Withholding the Tobacco Surcharge from a participant's paycheck and placing it in the Health Plan Trust account; and

d.      Directing Cigna and Aetna regarding how completions of the tobacco cessation programs are reported.

32.     From July 1, 2011, through June 30, 2012, the Tobacco Surcharge was $35 per month per Health Plan participant, regardless of the number of tobacco users in an enrolled Health Plan participant's family.

33.     From July 1, 2012, through the present, the Tobacco Surcharge was $45 per month per Health Plan participant, regardless of the number of tobacco users in an enrolled Health Plan participant's family.

34.     Upon information and belief, the documents governing the Tobacco Surcharge Wellness Program from July 1, 2011, through June 30, 2012, include the information sheet

---

[2] From July 1, 2012, through December 31, 2014, Aetna administered the "Breathe" tobacco cessation program, and from January 1, 2015, through June 30, 2015, Aetna administered the "Journeys – Be Tobacco Free" tobacco cessation program.

entitled "CareAllies Quit Today Tobacco Cessation Program; Action Required by September 22, 2011," the Tobacco Affidavit, the information sheet entitled "Frequently Asked Questions, Tobacco Surcharge," and the "Tobacco Designation" election screen from the Plan's online benefits enrollment application.

35.    The documents governing the Tobacco Surcharge Wellness Program since 2012 include the Tobacco Affidavit, the information sheet, "Frequently Asked Questions, Tobacco Surcharge," and the "Tobacco Designation" election screen from the Plan's online benefits enrollment application.

36.    From July 1, 2012, through the present, the information sheet entitled "Frequently Asked Questions, Tobacco Surcharge," has required all Plan participants to submit a Tobacco Affidavit (or its electronic equivalent) during the Plan's online, open enrollment process and when there is a change in tobacco-use status of a Covered Member. [3]

37.    From at least July 1, 2011, through the present, Macy's' own description of the Tobacco Surcharge Wellness Program and the Health Plan described the methodology for the collection and use of the Tobacco Surcharge.

38.    From July 1, 2012, through the present, Macy's "Frequently Asked Questions, Tobacco Surcharge," has stated, "The tobacco surcharge funds that are collected will be deposited into the Macy's, Inc. Welfare Benefits Plan Trust and will be used to pay medical claims and plan administrative expenses."

39.    From at least July 1, 2011, through the present, the Tobacco Surcharges held in the Health Plan trust account were used to fund Health Plan claims associated with the Plan's self-funded arrangements and administrative expenses of the Plan.

---

[3] "Covered Member" means a Health Plan participant and/or her participating dependent(s).

7

40.     From at least July 1, 2011, through the present, Macy's responsibility with respect to the funding of Health Plan claims and administrative expenses relating to the Plan's self-funded arrangements equaled the amount by which the Health Plan's claims and administrative expenses exceeded all participant contributions, including the Tobacco Surcharges.

## COUNT ONE
**Macy's', Anthem's, and Cigna's Failure to Reimburse Out-of-Network Claims Pursuant to the Plan Document**

41.     Paragraphs 1 through 25 above are realleged and incorporated in these allegations.

42.     From July 1, 2008, through June 30, 2012, the Summary Plan Description Addenda provided that reimbursement of out-of-network claims would be paid based on the "maximum reimbursable charge (also sometimes referred to as the 'reasonable and customary' or 'usual and customary' charge)".

43.     From July 1, 2008, through June 30, 2012, the Summary Plan Description Addenda provided that the maximum reimbursable charge "is the lesser of: the provider's normal charge for a similar service or supply; or the amount determined by the claims administrator, calculated based on criteria established from time to time by the claims administrator which takes into account all charges made by providers of such service or supply in the geographic area where it is received."

44.      From July 1, 2008, through June 30, 2012, the Summary Plan Description Addenda provided that charges were "the actual billed charges; except when the provider has contracted directly or indirectly with the claims administrator for a different amount."

45.     From at least July 1, 2008, through June 30, 2012, Macy's used Anthem and Cigna as claims administrators for the Health Plan's self-funded arrangements.

46. Anthem and Cigna processed Health Plan claims based primarily on the geographic region of Health Plan participants.

47. From at least July 1, 2008, through June 30, 2011, Anthem utilized a database product owned by Ingenix, Inc., ("Ingenix database") in the determination of the maximum reimbursable charge paid by the Health Plan.

48. The Ingenix database was a database created by UnitedHealth Group and utilized by many claims administrators in the determination of claim reimbursement levels.

49. The methodology of the Ingenix database relied on the price charged for healthcare service providers' services.

50. From July 1, 2008, through June 30, 2011, Macy's advised Anthem to pay the out-of-network reimbursement for claims processed by Anthem at the lesser of: the provider's normal charge for a similar service or supply; or between the 75th and 80th percentile of usual and customary charges for the coverage period.

51. In April 2011, Anthem recommended that Macy's use a reimbursement rate based on Medicare (the "Medicare Allowable Rate") to process out-of-network claim reimbursements relating to the Health Plan's self-funded arrangement when the Medicare Allowable Rate was less than the provider's normal charge for a similar service or supply.

52. On May 9, 2011, Jane Feil, Macy's Manager of Health Plans, sent an email to Anthem advising that Macy's will follow Anthem's recommendation.

53. As a result of Ms. Feil's email, beginning July 1, 2011, Anthem ceased the use of an Ingenix database and began using the Medicare Allowable Rate, which is based on provider costs rather than provider charges, as the basis for the maximum reimbursable charge for out-of-

network claims when the Medicare Allowable Rate is less than the provider's normal charge for a similar service or supply.

54.     Effective July 1, 2011, Anthem used the lesser of: the provider's normal charge for a similar service or supply; or 285% of the Medicare Allowable Rate to calculate the out-of-network reimbursement for claims processed by Anthem.

55.     Anthem did not ask Macy's to provide an amended Health Plan document that reflected the change in reimbursement methodology.

56.     From July 1, 2011, forward, Macy's did not object or stop Anthem from using the lesser of: the provider's normal charge for a similar service or supply; or 285% of the Medicare Allowable Rate to calculate the out-of-network reimbursement for claims processed by Anthem.

57.     From July 1, 2011, through June 30, 2012, Macy's did not amend the Health Plan documents in a "written action approved by the Chief Executive Officer, or any officer of the Company to whom he delegates such authority as he deems appropriate" as required by the "Federated Department Stores, Inc. Welfare Benefits Plan (No. 941)" (signed Dec. 22, 2000) to reflect the change in reimbursement methodology.

58.     From July 1, 2011, through June 30, 2012, the Summary Plan Description Addenda as administered by Anthem were not amended to include language indicating that the Medicare Allowable Rate would be used to process out-of-network claim reimbursements when the Medicare Allowable Rate was less than the provider's normal charge for a similar service or supply.  Health Plan participants were not provided a written notification of this material modification to the Health Plan.

59.     From at least July 1, 2008, through June 30, 2009, Cigna utilized an Ingenix database in the determination of the maximum reimbursable charge paid by the Health Plan.

60.     From July 1, 2008, through June 30, 2009, Macy's advised Cigna to pay the out-of-network reimbursement for claims processed by Cigna at the lesser of: the provider's normal charge for a similar service or supply; or the 80th percentile of usual and customary charges for the coverage period.

61.     In February 2009, Cigna recommended that Macy's use the Medicare Allowable Rate to process out-of-network claim reimbursements relating to the Health Plan's self-funded arrangement when the Medicare Allowable Rate was less than the provider's normal charge for a similar service or supply.

62.     On February 20, 2009, Ms. Feil sent an email to Cigna advising that Macy's would follow Cigna's recommendation.

63.     As a result of Ms. Feil's email, beginning July 1, 2009, Cigna ceased the use of an Ingenix database and began using the Medicare Allowable Rate, which is based on provider costs rather than provider charges, as the basis for the maximum reimbursable charge for out-of-network claims when the Medicare Allowable Rate is less than the provider's normal charge for a similar service or supply.

64.     Effective July 1, 2009, Cigna used the lesser of: the provider's normal charge for a similar service or supply; or 200% of the Medicare Allowable Rate to calculate the out-of-network reimbursement for claims processed by Cigna.

65.     Cigna did not ask Macy's to provide an amended Health Plan document that reflected the change in reimbursement methodology.

66.     From July 1, 2009, forward, Macy's did not object or stop Cigna from using the lesser of: the provider's normal charge for a similar service or supply; or 200% of the Medicare Allowable Rate to calculate the out-of-network reimbursement for claims processed by Cigna.

67.     From July 1, 2009, through June 30, 2012, Macy's did not amend the Health Plan documents in a "written action approved by the Chief Executive Officer, or any officer of the Company to whom he delegates such authority as he deems appropriate" as required by the "Federated Department Stores, Inc. Welfare Benefits Plan (No. 941)" (signed Dec. 22, 2000) to reflect the change in reimbursement methodology.

68.     From July 1, 2009, through June 30, 2012, the Summary Plan Description Addenda as administered by Cigna were not amended to include language indicating that the Medicare Allowable Rate would be used to process out-of-network claim reimbursements when the Medicare Allowable Rate was less than the provider's normal charge for a similar service or supply.  Health Plan participants were not provided a written notification of this material modification to the Health Plan.

69.     By failing to follow the Health Plan document as alleged in paragraphs 41 through 58 above, Macy's and Anthem:

     a.     failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

     b.     failed to discharge their duties in accordance with the documents and instruments governing the Health Plan insofar as the documents and instruments are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

70.     By failing to follow the Health Plan document as alleged in paragraphs 41 through 46 and 59 through 68 above, Macy's and Cigna:

a.      failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

b.      failed to discharge their duties in accordance with the documents and instruments governing the Health Plan insofar as the documents and instruments are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

<u>COUNT TWO</u>
**Anthem's Co-Fiduciary Liability with Respect to the Health Plan**

71.      Paragraphs 1 through 25 above are realleged and incorporated in these allegations.

72.      The Administrative Services Only ("ASO") agreement between Macy's and Anthem gave Anthem sole and absolute fiduciary authority to determine claims for benefits under the Health Plan as well as the sole and absolute authority to act as the appropriate fiduciary under Section 503 of ERISA to determine appeals of any adverse benefit determinations.

73.      From July 1, 2011, through June 30, 2012, Anthem failed to ensure that Macy's administered the Health Plan in accordance with the Health Plan's governing documents.

74.      By its acts and omissions described in paragraph 73 above, Anthem failed to discharge its duties with respect to the Health Plan solely in the interest of the participants and beneficiaries, in violation of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

75.      By its acts and omissions described in paragraph 73 above, Anthem is liable, pursuant to ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), for the breaches of fiduciary responsibility by co-fiduciary Macy's with respect to the Health Plan, as described in paragraphs 41 through 58 above, because, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §

1104(a)(1), in the administration of its specific responsibilities, it enabled another fiduciary to commit a breach.

## COUNT THREE
### Cigna's Co-Fiduciary Liability with Respect to the Health Plan

76.     Paragraphs 1 through 25 above are realleged and incorporated in these allegations.

77.     The ASO agreement between Macy's and Cigna gave Cigna sole and absolute fiduciary authority to determine claims for benefits under the Health Plan.

78.     From July 1, 2009, through June 30, 2012, Cigna failed to ensure that Macy's administered the Health Plan in accordance with the Health Plan's governing documents.

79.     By its acts and omissions described in paragraph 78 above, Cigna failed to discharge its duties with respect to the Health Plan solely in the interest of the participants and beneficiaries, in violation of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

80.     By its acts and omissions described in paragraph 78 above, Cigna is liable, pursuant to ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), for the breaches of fiduciary responsibility by co-fiduciary Macy's with respect to the Health Plan, as described in paragraphs 41 through 46 and 59 through 68 above, because, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of its specific responsibilities, it enabled another fiduciary to commit a breach.

## COUNT FOUR
### Macy's Co-Fiduciary Liability with Respect to the Health Plan

81.     Paragraphs 1 through 25, 72, and 77 above are realleged and incorporated in these allegations.

82.     From July 1, 2011, through June 30, 2012, Macy's failed to ensure that Anthem administered the Health Plan in accordance with the Health Plan's governing documents.

83. By its acts and omissions described in paragraph 82 above, Macy's failed to discharge its duties with respect to the Health Plan solely in the interest of the participants and beneficiaries, in violation of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

84. By its acts and omissions described in paragraph 82 above, Macy's is liable, pursuant to ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), for the breaches of fiduciary responsibility by co-fiduciary Anthem with respect to the Health Plan, as described in paragraphs 41 through 58 above, because, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of its specific responsibilities, it enabled another fiduciary to commit a breach.

85. From July 1, 2009, through June 30, 2012, Macy's failed to ensure that Cigna administered the Health Plan in accordance with the Health Plan's governing documents.

86. By its acts and omissions described in paragraph 85 above, Macy's failed to discharge its duties with respect to the Health Plan solely in the interest of the participants and beneficiaries, in violation of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

87. By its acts and omissions described in paragraph 85 above, Macy's is liable, pursuant to ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), for the breaches of fiduciary responsibility by co-fiduciary Cigna with respect to the Health Plan, as described in paragraphs 41 through 46 and 59 through 68 above, because, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of its specific responsibilities, it enabled another fiduciary to commit a breach.

## COUNT FIVE
**Impermissible Wellness Program from July 1, 2011, through June 30, 2012
(Plan Year 2011)**

88.     Paragraphs 1 through 9 and 26 through 40 above are realleged and incorporated in

these allegations.

89.     ERISA § 702, 29 U.S.C. § 1182, prohibits group health plans from discriminating

against individuals in eligibility and continued eligibility for benefits and in individual premium

or contribution rates on the basis of any health-status related factor.

90.     The regulations in effect at 29 C.F.R. § 2590.702(f)(2) (2007) for a wellness

program based on an individual satisfying a standard that is related to a health factor, such as the

Tobacco Surcharge Wellness Program, during Plan years July 1, 2011, through June 30, 2014,

required, inter alia, that the following three factors be met in order for the wellness program to

satisfy an exception to the general prohibitions against discrimination on the basis of any health-

status related factor:

    a.      The wellness program's reward "must be available to all similarly situated

    individuals," which means that the wellness program must allow "a reasonable alternative

    standard (or waiver of the otherwise applicable standard) for obtaining the reward for any

    individual for whom, for that period, it is either unreasonably difficult due to a medical

    condition to satisfy the otherwise applicable standard . . . or medically inadvisable to

    attempt to satisfy the otherwise applicable standard" (29 C.F.R. §

    2590.702(f)(2)(iv)(A)(1)-(2) (2007)); and

    b.      "The plan or issuer must disclose in all plan materials describing the terms

    of the program the availability of a reasonable alternative standard (or the possibility of

    waiver of the otherwise applicable standard) . . .  [unless] the plan materials merely

mention that a program is available without describing its terms" (*Id.* §

2590.702(f)(2)(v)(A) (2007)).

91.     Macy's offered Covered Members a one-time opportunity to avoid the Tobacco

Surcharge from October 1, 2011, through April 30, 2012, by requiring Health Plan participants

to:

>       a.      Declare a Covered Member is a tobacco user;

>       b.      Inform the Plan prior to September 22, 2011, that the Covered Member

will join a tobacco cessation program;

>       c.      Have the Covered Member enroll in a tobacco cessation program;

>       d.      Return the Tobacco Affidavit to Macy's between April 1, 2012, and May

1, 2012, indicating that all Covered Members have been tobacco free for six consecutive

months.

92.     From July 1, 2011, through June 30, 2012, the Tobacco Surcharge Wellness

Program did not allow "a reasonable alternative standard (or waiver of the otherwise applicable

standard) for obtaining the reward for any individual for whom, for that period, it is either

unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard . . .

or medically inadvisable to attempt to satisfy the otherwise applicable standard."

93.     From at least July 1, 2011, through June 30, 2012, the Tobacco Surcharge

Wellness Program materials did not provide notice of a reasonable alternative standard (or

waiver of the otherwise applicable standard) to avoid the Tobacco Surcharge for any individual

for whom it was unreasonably difficult due to a medical condition or medically inadvisable to

attempt to achieve the standards of the program.

17

94.     With the possible exception of Health Plan participants who took the steps described in paragraph 91 above, from at least July 1, 2011, through June 30, 2012, Health Plan participants who entered one of Macy's tobacco cessation programs in an attempt to quit using tobacco products were still required to pay the Tobacco Surcharge.

95.     With the possible exception of Health Plan participants who took the steps described in paragraph 91 above, from at least July 1, 2011, through June 30, 2012, the only method for Health Plan participants to avoid the tobacco surcharge was to meet the standards of the Tobacco Surcharge Wellness Program, which included declaring that all Covered Members remained tobacco free for a period of six consecutive months during the Health Plan year.

96.     Accordingly, the Tobacco Surcharge Wellness Program did not meet the regulatory requirements to be a non-discriminatory wellness program under ERISA § 702 from July 1, 2011, through June 30, 2012.

97.     By the allegations described in paragraphs 88 through 96 above, Macy's:

        a.      failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

        b.      failed to discharge its duties in accordance with the documents and instruments governing the Health Plan insofar as the documents and instruments are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

        c.      caused the Health Plan to engage in transactions that Macy's knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit

18

of, a party in interest, of assets of the Health Plan, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D);

      d.     dealt with assets of the Health Plan in Macy's' own interests in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1);

      e.     acted on behalf of a party whose interests are adverse to the interests of the Health Plan or the interests of its participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2); and

      f.     jointly with the Health Plan, caused the Health Plan to require participants to pay a premium or contribution which was greater than such premium or contribution for a similarly situated participant enrolled in the Health Plan on the basis of a health status-related factor in relation to the participant or to an individual enrolled under the Health Plan as a dependent of the individual , in violation of ERISA § 702(b), 29 U.S.C. § 1182(b).

**<u>COUNT SIX</u>**
**Impermissible Wellness Program from July 1, 2012, through June 30, 2013**
**(Plan Year 2012)**

98.     Paragraphs 1 through 9, 26 through 40, and 89 through 90 above are realleged and incorporated in these allegations.

99.     From July 1, 2012, through June 30, 2013, the Tobacco Surcharge Wellness Program did not allow "a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is either unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard . . . or medically inadvisable to attempt to satisfy the otherwise applicable standard."

100. From at least July 1, 2012, through June 30, 2013, the Tobacco Surcharge Wellness Program materials, including the Tobacco Affidavit, did not provide notice of a reasonable alternative standard (or waiver of the otherwise applicable standard) to avoid the Tobacco Surcharge for any individual for whom it was unreasonably difficult due to a medical condition or medically inadvisable to attempt to achieve the standards of the program.

101. From July 1, 2012, through June 30, 2013, Health Plan participants who entered one of Macy's tobacco cessation programs in an attempt to quit using tobacco products were still required to pay the Tobacco Surcharge.

102. From July 1, 2012, through June 30, 2013, the Tobacco Affidavit stated the following: "I understand that the tobacco surcharge will not be changed retroactively and no refunds or credits will be issued."

103. From July 1, 2012, through June 30, 2013, the only method for Health Plan participants to avoid the tobacco surcharge was to meet the standards of the Tobacco Surcharge Wellness Program, which included declaring that all Covered Members remained tobacco free for a period of six consecutive months during the Health Plan year.

104. Accordingly, the Tobacco Surcharge Wellness Program did not meet the regulatory requirements to be a non-discriminatory wellness program under ERISA § 702 from July 1, 2012, through June 30, 2013.

105. By the allegations described in paragraphs 98 through 104 above, Macy's:

   a.    failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

20

b.     failed to discharge its duties in accordance with the documents and instruments governing the Health Plan insofar as the documents and instruments are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

c.     caused the Health Plan to engage in transactions that Macy's knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Health Plan, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D);

d.     dealt with assets of the Health Plan in Macy's' own interests in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1);

e.     acted on behalf of a party whose interests are adverse to the interests of the Health Plan or the interests of its participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2); and

f.     jointly with the Health Plan, caused the Health Plan to require participants to pay a premium or contribution which was greater than such premium or contribution for a similarly situated participant enrolled in the Health Plan on the basis of a health status-related factor in relation to the participant or to an individual enrolled under the Health Plan as a dependent of the individual, in violation of ERISA § 702(b), 29 U.S.C. § 1182(b).

## COUNT SEVEN
**Impermissible Wellness Program from July 1, 2013, through June 30, 2014
(Plan Year 2013)**

106.    Paragraphs 1 through 9, 26 through 40, and 89 through 90 above are realleged and incorporated in these allegations.

107.    From July 1, 2013, through June 30, 2014, Health Plan participants who entered one of Macy's tobacco cessation programs in an attempt to quit using tobacco products were still required to pay the Tobacco Surcharge.

108.    The Tobacco Affidavit effective from July 1, 2013, through June 30, 2014, included the following notices:

        a.    "I understand that the tobacco surcharge will apply unless: (1) it is unreasonably difficult for the Tobacco Users identified above to quit using tobacco to avoid the tobacco surcharge; or (2) it is medically inadvisable for the Tobacco Users identified above to quit using tobacco to avoid the surcharge.  I understand that if the Tobacco Users designated above meet either of these criteria, Macy's, Inc. will make available a reasonable alternative standard, which must be satisfied by all Tobacco Users in order to avoid the tobacco surcharge. I understand that I may contact HR Services . . . to learn more about the availability of a reasonable alternative standard" and

        b.    "I understand that the tobacco surcharge will not be changed retroactively and no refunds or credits will be issued."

109.    Because the Tobacco Affidavit described in paragraph 108 above stated no refunds or reimbursements were available to participants who completed the reasonable alternative in Plan year 2013, the Tobacco Surcharge Wellness Program failed to meet the requirement that the reward (i.e., avoiding the Tobacco Surcharge for the entire Plan year) be available to all similarly situated individuals of a wellness program.

110.    Accordingly, the Tobacco Surcharge Wellness Program did not meet the regulatory requirements to be a non-discriminatory wellness program under ERISA § 702 from July 1, 2013, through June 30, 2014.

111. By the allegations described in paragraphs 106 through 110 above, Macy's:

a.      failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.      failed to discharge its duties in accordance with the documents and instruments governing the Health Plan insofar as the documents and instruments are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

c.      caused the Health Plan to engage in transactions that Macy's knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Health Plan, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D);

d.      dealt with assets of the Health Plan in Macy's' own interests in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1);

e.      acted on behalf of a party whose interests are adverse to the interests of the Health Plan or the interests of its participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2); and

f.      jointly with the Health Plan, caused the Health Plan to require participants to pay a premium or contribution which was greater than such premium or contribution for a similarly situated participant enrolled in the Health Plan on the basis of a health status-related factor in relation to the participant or to an individual enrolled under the

Health Plan as a dependent of the individual, in violation of ERISA § 702(b), 29 U.S.C. § 1182(b).

## COUNT EIGHT
**Impermissible Wellness Program from July 1, 2014, through the Present**
**(Plan Years 2014 through the Present)**

112.     Paragraphs 1 through 9, 26 through 40, and 89 above are realleged and incorporated in these allegations.

113.     The regulations in effect at 29 C.F.R. § 2590.702(f)(4) (2014) for an outcome-based wellness program based on an individual satisfying a standard that is related to a health factor, such as the Tobacco Surcharge Wellness Program, during Plan years July 1, 2014, through the present, require, inter alia, that the following two factors be met in order for the outcome-based wellness program to satisfy an exception to the general prohibitions against discrimination on the basis of any health-status related factor:

    a.     "The full reward under the outcome-based wellness program must be available to all similarly situated individuals", which means that the wellness program must allow "a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual who does not meet the initial standard based on the measurement, test, or screening"  (29 C.F.R. § 2590.702(f)(4)(iv)(A) (2014)); and

    b.     "The plan or issuer must disclose in all plan materials describing the terms of an outcome-based wellness program . . . the availability of a reasonable alternative standard to qualify for the reward (and, if applicable, the possibility of waiver of the otherwise applicable standard) . . . [unless] plan materials merely mention that such a

program is available, without describing its terms . . . ." (*Id.* § 29 C.F.R. §

2590.702(f)(4)(v) (2014).

114.    The Tobacco Affidavit effective from July 1, 2014, through the present required

completion of the following "Associate and Dependent Tobacco Designation":

a.    "□ I and/or one or more of my enrolled dependents is/are a

Tobacco User."

b.    "□ I and all my enrolled dependents are Tobacco Free."

c.    "□ I and all my enrolled dependents who are not Tobacco Free

have completed a reasonable alternative standard during the current plan

year to avoid the tobacco surcharge for the current plan year.  *I further*

*certify that*:" (emphasis added)

i.    "□ I and/or one or more of my enrolled dependents

is/are still a Tobacco User, or"

ii.    "□ *I and all of my enrolled dependents are either*

*Tobacco Free and/or no longer using Tobacco*

*products and working towards Tobacco Free status*."

(emphasis added)

d.    "□ I mistakenly designated Tobacco User status during

enrollment and I and all of my enrolled dependents were not a Tobacco

User when I enrolled."

115.    The Tobacco Affidavit described in paragraph 114 above requires participants to

certify either they have met the original standard of being tobacco free or are working towards

meeting the original standard of being tobacco free in order to avoid the Tobacco Surcharge.

25

116.     Accordingly, the Tobacco Surcharge Wellness Program did not meet the regulatory requirements to be a non-discriminatory wellness program under ERISA § 702 from July 1, 2014, through the present.

117.     By the allegations described in paragraphs 112 through 116 above, Macy's:

a.     failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.     failed to discharge its duties in accordance with the documents and instruments governing the Health Plan insofar as the documents and instruments are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

c.     caused the Health Plan to engage in transactions that Macy's knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Health Plan, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D);

d.     dealt with assets of the Health Plan in Macy's' own interests in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1);

e.     acted on behalf of a party whose interests are adverse to the interests of the Health Plan or the interests of its participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2); and

f.     jointly with the Health Plan, caused the Health Plan to require participants to pay a premium or contribution which was greater than such premium or contribution

26

for a similarly situated participant enrolled in the Health Plan on the basis of a health

status-related factor in relation to the participant or to an individual enrolled under the

Health Plan as a dependent of the individual, in violation of ERISA § 702(b), 29 U.S.C. §

1182(b).

## PRAYER FOR RELIEF

**WHEREFORE**, the Secretary prays that this Court enter a judgment:

A.      Permanently enjoining each Defendant from violating the provisions of Title I of

ERISA and to administer the Plan in compliance with ERISA § 702, 29 U.S.C. § 1182 and the

implementing regulations;

B.      Appointing an Independent Fiduciary at Macy's and Cigna's expense to

readjudicate all out-of-network claims that were processed by Cigna from July 1, 2009, through

June 30, 2012, to restore to participants all amounts they were required to pay pursuant to the

Plan documents that are greater than what was paid in operation plus interest and all unjust

enrichment or profits resulting from the conduct alleged in Count One of this Complaint;

C.      Appointing an Independent Fiduciary at Macy's and Anthem's expense to

readjudicate all out-of-network claims that were processed by Anthem from July 1, 2011,

through June 30, 2012, to restore to participants all amounts they were required to pay pursuant

to the Plan documents that are greater than what was paid in operation plus interest and all unjust

enrichment or profits resulting from the conduct alleged in Count One of this Complaint;

D.      Ordering Macy's, Cigna, and Anthem to pay all reasonable costs and expenses of

the Independent Fiduciary in readjudicating the out-of-network claims set forth above and the

reasonable costs and expenses associated with correcting all improperly adjudicated claims

identified in Count One of this Complaint;

E.      Requiring Macy's to reimburse all participants who paid the Tobacco Surcharge from July 1, 2011, through the present plus interest;

F.      Requiring Macy's to revise any Tobacco Surcharge Wellness Program it intends to maintain to comply with ERISA § 702, 29 U.S.C. § 1182, and its implementing regulations;

G.      Enjoining Macy's from collecting Tobacco Surcharges until Macy's revises its Tobacco Surcharge Wellness Program to comply with ERISA § 702, 29 U.S.C. § 1182, and its implementing regulations;

H.      Requiring each Defendant to disgorge all unjust enrichment or profits received as a result of fiduciary breaches committed by them or for which they are liable;

I.      Awarding the Secretary the costs of this action; and

    J.      Ordering such further relief as is appropriate and just.

                                **NICHOLAS C. GEALE**
                                Acting Solicitor of Labor

                                **CHRISTINE Z. HERI**
                                Regional Solicitor

                                **s/ R. Peter Nessen**
                                R. Peter Nessen
                                Senior Trial Attorney for the Secretary of Labor
                                Office of the Solicitor
                                U.S. Department of Labor
                                230 South Dearborn Street
                                Eighth Floor
                                Chicago, Illinois 60604
                                Telephone:  (312) 353-1216
                                Email: nessen.peter@dol.gov

                                **s/ Kevin M. Wilemon**
                                Kevin M. Wilemon
                                Trial Attorney for the Secretary of Labor
                                Office of the Solicitor
                                U.S. Department of Labor
                                230 South Dearborn Street
                                Eighth Floor
                                Chicago, Illinois 60604
                                Telephone:  (312) 353-6973
                                Email: wilemon.kevin@dol.gov

                                Attorneys for R. Alexander Acosta,
                                Secretary of Labor,
                                United States Department of Labor,
                                Plaintiff