## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**SECRETARY OF LABOR,**

        **Plaintiff,**

                                  **Case No. 1:17-cv-541**

        **v.**                      **JUDGE DOUGLAS R. COLE**

**MACY'S, INC., et al.,**

        **Defendants.**

### OPINION AND ORDER

This matter comes before the Court on Defendants Connecticut General Life Insurance Company ("Cigna"), Anthem Blue Cross Life and Health Insurance Company ("Anthem"), Macy's, Inc., and Macy's, Inc. Welfare Benefits Plan's (together "Macy's") Motions to Dismiss (Docs. 36, 37, 38) the Secretary of Labor's (the "Secretary") Amended Complaint (Doc. 4). For the reasons explained below, the Court **GRANTS** Cigna's and Anthem's Motions (Docs. 36, 38) in their entirety, thereby **DISMISSING WITH PREJUDICE** the Secretary's claims against Cigna and Anthem. The Court **GRANTS IN PART** and **DENIES IN PART** Macy's Motion (Doc. 37). Specifically, the Court **GRANTS** Macy's Motion (Doc. 37) as to the Secretary's claims arising out of the out-of-network reimbursement methodology, and thus **DISMISSES** those claims **WITH PREJUDICE**. The Court also **GRANTS** Macy's Motion (Doc. 37) as to the Secretary's claims for breach of fiduciary duty arising out of the Tobacco Surcharge Wellness Program for Macy's Health Plan Years 2011–2013, and **DISMISSES** those claims **WITH PREJUDICE**. The Court further **GRANTS** Macy's Motion (Doc. 37) with respect to the Secretary's claims for

discriminatory wellness program and breach of fiduciary duty in connection with the Tobacco Surcharge Wellness Program for Health Plan Years 2014 and following and **DISMISSES** those claims, but **WITHOUT PREJUDICE**. The Court **DENIES** Macy's Motion (Doc. 37) with respect to the Secretary's claims for discriminatory wellness program for Health Plan Years 2011–2013. The Court **GRANTS** the Secretary leave to further amend his Amended Complaint (Doc. 4) to state a claim for discriminatory wellness program and breach of fiduciary duty with respect to the Tobacco Surcharge Wellness Program for Macy's Health Plan Years 2014 and following. But the Court **DENIES** leave to further amend the Amended Complaint (Doc. 4) in all other respects.

## BACKGROUND

For purposes of a motion to dismiss, the Court accepts as true the factual allegations in the Complaint. Thus, the Court reports and relies on those allegations here, but with the disclaimer that these facts are not yet established, and may never be.

On August 16, 2017, the Secretary of Labor (the "Secretary") filed the original Complaint in this action. (Doc. 1). On August 29, 2017, the Secretary filed an Amended Complaint, the operative complaint in this action. (Doc. 4). In general terms, the Amended Complaint alleges Defendants violated the Employee Retirement Income Security Act ("ERISA") in two separate ways. First, the Amended Complaint alleges that all Defendants violated the Macy's Health Plan (the "Health Plan" or "Plan") documents when they used an out-of-network reimbursement

methodology based on the Medicare Allowable Rate, which is in turn based on the cost to a provider of providing a medical service (i.e., a cost-plus model), as opposed to the prices typically charged to patients for that service (i.e., a market-price model), and thereby violated their fiduciary duties under ERISA. Second, the Amended Complaint alleges that Macy's operated a discriminatory wellness program in violation of ERISA (and Macy's fiduciary duties) in that Macy's imposed a fee on Health Plan participants who use tobacco.

In regard to the out-of-network reimbursement methodology, the Secretary alleges that Defendants failed to follow Plan documents in reimbursing out-of-network claims made against the self-funded portion of the Health Plan. Specifically, the Secretary alleges that between July 1, 2008, and June 30, 2012, the Summary Plan Description Addenda ("the Addenda") specified that reimbursement of out-of-network claims would be based on the "maximum reimbursable charge (also sometimes referred to as the 'reasonable and customary' or 'usual and customary' charge)." (Am. Compl., Doc. 4, ¶ 42, #55). The Addenda defined the "maximum reimbursable charge" as "the lesser of: the provider's normal charge for a similar service or supply; or the amount determined by the claims administrator, calculated based on criteria established from time to time by the claims administrator which takes into account all charges made by providers of such service or supply in the geographic area where it is received." (*Id.* at ¶ 43, #55). And the Addenda defined "charges" as "the actual billed charges; except when the provider has contracted directly or indirectly with the claims administrator for a different amount." (*Id.* at

3

¶ 44, #55). In other words, the plan documents provided that reimbursement would be set by reference to market prices.

Consistent with that, from July 1, 2008, through June 30, 2011, Anthem, which adjudicated claims for the self-funded portion of the Health Plan, used a market-price reimbursement methodology that reimbursed at the lesser of the provider's normal charge or between the 75th and 80th percentile of the usual and customary charge as calculated by a database called Ingenix. (*Id.* at ¶ 48, 50, #9). On July 1, 2011, however, Anthem, on Macy's instruction, began using the Medicare Allowable Rate instead of the usual and customary charge to determine the maximum out-of-network reimbursement. (*Id.* at ¶ 53, #56). Specifically, Anthem began reimbursing at 285 percent of the Medicare Allowable Rate. (*Id.* at ¶ 54, #57). The Medicare Allowable Rate reflects a cost-based model. That is, the rate is based on the cost to a provider of providing a service, rather than the price charged to patients. (*Id.* at ¶ 53, #56–57). Moreover, Macy's did not amend the Addenda according to the required procedures to reflect the change, and Anthem did not ask Macy's to do so. (*Id.* at ¶¶ 55, 57, #57).

Cigna also adjudicated claims for the self-funded portion of the Health Plan. Like Anthem, it originally used the Ingenix database to calculate the maximum reimbursable charge, reimbursing at the lesser of the provider's normal charge or the 80th percentile of usual and customary charges. (*Id.* at ¶¶ 59, 60, #57–58). Beginning on July 1, 2009, though, Cigna instead began reimbursing at the lesser of the provider's normal charge or 200 percent of the Medicare Allowable Rate. (*Id.* at ¶ 64, #58). Again, Cigna did not ask Macy's to amend the Plan documents to reflect the

change in reimbursement methodology, and Macy's did not do so. (*Id.* at ¶¶ 65, 67, #58, 59).

The Secretary alleges that the Defendants' failure to follow the Addenda's specifications regarding out-of-network reimbursement methodology violated ERISA's fiduciary duties provision, 29 U.S.C. § 1104, in two ways. First, Defendants failed to act solely in the interests of the participants and beneficiaries of the Health Plan in violation of 29 U.S.C. § 1104(a)(1)(A). (Am. Compl., Doc. 4, ¶ 69(a), #59). Second, Defendants failed to discharge their duties in accordance with the documents governing the Plan in violation of 29 U.S.C. § 1104(a)(1)(D). (*Id.* at ¶ 69(b), #59).

The Amended Complaint's second set of factual allegations, this time against Macy's only, concerns what it calls the Tobacco Surcharge and corresponding Tobacco Surcharge Wellness Program ("TSWP"). The Secretary alleges that from "at least" July 1, 2011, to the present, the Health Plan assessed a surcharge for employees and their dependents enrolled in company-sponsored medical coverage who had used tobacco products within the previous six months. (*Id.* at ¶ 27, #52). During that same period, Macy's provided Health Plan participants free access to tobacco cessation programs, which sometimes were administered by Anthem, and at other times by Cigna. (*Id.* at ¶ 28, #52). For the one-year period from July 1, 2011, to June 30, 2012, the Tobacco Surcharge was $35 per month per affected Plan participant, regardless of the number of tobacco users covered by an enrolled Plan participant's policy (e.g., as dependents). (*Id.* at ¶ 32, #53). After July 1, 2012, the Tobacco Surcharge was $45

per month per affected participant (again without respect to the number of tobacco-user dependents). (*Id.* at ¶ 33, #53).

The Amended Complaint further alleges that, from October 1, 2011, to April 30, 2012, the Health Plan participants and their dependents who used tobacco had a one-time opportunity to avoid the Tobacco Surcharge by declaring that they were tobacco users, but then (1) informing the Plan prior to September 22, 2011, that they would enroll in a tobacco cessation program, (2) doing so, and (3) returning what the Amended Complaint calls a Tobacco Affidavit between April 1, 2012, and May 1, 2012, in which they stated that they had been tobacco-free for six months. (*Id.* at ¶ 91, #64). The Amended Complaint alleges that taking these steps (including becoming tobacco-free) was the only way for tobacco users to avoid the Tobacco Surcharge. (*Id.* at ¶ 95, #65). The Amended Complaint contains substantially similar allegations with respect to Health Plan Year 2012. (*See id.* at #66–68).

With respect to Health Plan Year 2013, the Secretary acknowledges that the Tobacco Affidavit now included notice of an opportunity for individuals, for whom it was either unreasonably difficult due to a medical condition or medically inadvisable to cease using tobacco products, to avoid the Tobacco Surcharge by completing a reasonable alternative standard. (*Id.* at ¶ 108(a), #69). The Secretary alleges, however, that the Tobacco Affidavit also stated that the Tobacco Surcharge would "not be changed retroactively and no refunds or credits [would] be issued." (*Id.* at ¶ 108(b), #69).

With respect to Health Plan Years 2014 and following, the Secretary alleges that the Tobacco Affidavit required Health Plan participants who availed themselves of the reasonable alternative standard to state whether they were still tobacco users or, instead, were no longer using tobacco products and either tobacco-free or working toward tobacco-free status.[1] (*Id.* at ¶ 114, #72). The Secretary also alleges, "upon information and belief," that "not all Health Plan participants who completed a purported reasonable alternative" under the TSWP "avoided or were reimbursed the Tobacco Surcharge for the entire Plan year." (*Id.* at ¶ 116, #73).

The Secretary's Amended Complaint (Doc. 4) alleges that the TSWP violated ERISA § 702, codified at 29 U.S.C. § 1182, because Macy's failed to allow a "reasonable alternative standard" for Plan participants—for whom it was either unreasonably difficult due to a medical condition or medically inadvisable to quit using tobacco products—to avoid paying the Tobacco Surcharge. (*Id.* at ¶ 92, #64). According to the Secretary, in failing to provide such an alternative, Macy's also breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104, as Macy's was (1) failing to act solely in the interests of participants and beneficiaries of the Health Plan and (2) failing to discharge its duties in accordance with documents governing the Health Plan insofar as they were consistent with ERISA. (*Id.* at ¶ 97, #65). Moreover, the Secretary alleges that collection of the Tobacco Surcharge constituted a self-dealing transaction—i.e., dealing with Health Plan assets in Macy's

---

[1] The Amended Complaint is not entirely clear as to the difference between no longer using tobacco products and being tobacco-free, but the Court surmises that it may concern the period of time that has elapsed since an individual stopped using tobacco products. The exact definition of "tobacco-free" is not material for purposes of the instant Motion.

own interests—and action on behalf of a party with interests that are adverse to those of Health Plan participants and beneficiaries, all in violation of ERISA § 406, 29 U.S.C. § 1106. (*Id.* at #65–66).

To rectify Defendants' alleged ERISA violations, the Amended Complaint (Doc. 4) requests numerous items of relief. Most notably, the Secretary asks that the Court appoint Independent Fiduciaries at Defendants' expense to re-adjudicate all out-of-network claims processed between July 1, 2009, and June 30, 2012, in the case of Cigna, and between July 1, 2011, and June 30, 2012, in the case of Anthem. (*Id.* at #74–75). Such re-adjudication would "restore to participants all amounts they were required to pay pursuant to the Plan documents that are greater than what was paid in operation plus interest and all unjust enrichment or profits" resulting from Defendants' alleged breaches of fiduciary duty. (*Id.*). The Amended Complaint also asks that the Court order Macy's to reimburse all participants who paid the Tobacco Surcharge from July 1, 2011, to the present, plus interest, order modification of any ongoing or future TSWP to comply with the requirements of ERISA § 702, 29 U.S.C. § 1182, and enjoin collection of future Tobacco Surcharges until such modification occurs. (*Id.*).

## THE PENDING MOTIONS

On October 1, 2018, Cigna, Macy's, and Anthem each filed Motions to Dismiss under Federal Rule of Civil Procedure 12(b)(6). (Docs. 36, 37, 38). Defendants argue the Secretary failed to state a claim upon which relief can be granted with respect to both (1) the out-of-network reimbursement methodologies, and (2) the Tobacco

Surcharge. As to the former, Defendants argue that, because ERISA contains no requirement to disclose the methodology for reimbursing out-of-network claims, failure to disclose that methodology cannot violate a fiduciary duty under ERISA. (Cigna Mot. to Dismiss ("Cigna Mot."), Doc. 36, #160–63; Macy's Mot. to Dismiss ("Macy's Mot."), Doc. 37, #184–85; Anthem Mot. to Dismiss ("Anthem Mot."), Doc. 38, #299). Of particular note here, Anthem also argues that the Secretary is not a proper party to bring the claims related to the out-of-network reimbursement methodology because the Secretary has not alleged any losses to the Plan as required under 29 U.S.C. § 1132(a)(2), but rather only to Plan participants, who have an adequate remedy of their own under 29 U.S.C. § 1132(a)(1)(B). (Anthem Mot., Doc. 38, #292–94). Anthem also argues that the Secretary may not sue under 29 U.S.C. § 1132(a)(5), a "catch-all" provision allowing the Secretary to seek injunctive relief, because the relief the Secretary seeks is not truly injunctive, but instead a form of monetary damages for Plan participants, who, as noted, have an adequate remedy under § 1132(a)(1)(B).

With respect to the TSWP for Plan Years 2011 and 2012, Macy's argues that the Secretary has failed to state a claim for a discriminatory wellness program under ERISA § 702, 29 U.S.C. § 1182, because "practically speaking" there would have been no need for a reasonable alternative to the options Macy's offered as "no doctor would ever support" a finding that it was either unreasonably difficult due to a medical condition to cease use of tobacco or medically inadvisable to do so. (Macy's Mot., Doc. 37, #191). As for the TSWP for Plan Year 2013, Macy's argues that it was not required

to reimburse Tobacco Surcharge payments for the full year to Plan participants who completed the reasonable alternative mid-year. (*Id.* at #192–93). And as for Plan Years 2014 and following, Macy's argues that the Secretary fails to plead sufficient facts to render plausible his claim that the TSWP was a discriminatory wellness program during those years. (*Id.* at #193–94). Macy's further argues that the Secretary has failed to state a claim for breach of fiduciary duty because Macy's was acting as a settlor rather than a fiduciary with respect to the TSWP. (*Id.* at #195).

On October 31, 2018, the Secretary responded in separate filings to each of the Defendants' various Motions to Dismiss, although there was substantial overlap in the content of the Secretary's Responses. (Docs. 39, 40, 41). In response to the argument that ERISA imposes no duty to disclose the methodology for reimbursement of out-of-network claims, the Secretary emphasizes that his Amended Complaint is for failure to follow the Health Plan documents rather than failure to disclose a change in the reimbursement methodology. (Resp. to Anthem Mot. to Dismiss ("Resp. to Anthem"), Doc. 39, #312–13; Resp. to Cigna Mot. to Dismiss ("Resp. to Cigna"), Doc. 40, #336–37). The Secretary argues that he may properly bring this action for injunctive relief because he is not required to show losses to the Health Plan or, in the alternative, that the Amended Complaint does allege losses to the Health Plan in three ways: (1) by inferentially alleging lower payouts for out-of-network treatments to Health Plan participants; (2) in the alternative, by alleging that the Plan improperly overpaid beneficiaries; and (3) by seeking re-adjudication of out-of-network claims, the costs of which will be borne by the Health Plan. (Resp. to

10

Anthem, Doc. 39, #317–20; Resp. to Cigna, Doc. 40, #342–44). The Secretary also argues that he may bring this suit under the "catch-all" provision because he seeks Plan-wide injunctive relief. (Resp. to Anthem, Doc. 39, #320).

Regarding the Tobacco Surcharge, the Secretary argues that both failure to allow a reasonable alternative and failure to retroactively reimburse Tobacco Surcharges violated statutory and regulatory requirements. (*Id.* at #359). According to the Secretary, the Amended Complaint alleges that Macy's acted as a fiduciary rather than a settlor in implementing the TSWP because it solely controlled all important aspects of the program. (*Id.* at #362).

On November 21, 2018, all three Defendants replied in support of their Motions. (Docs. 42, 43, 44). The matter is now fully briefed and before the Court.

## LEGAL STANDARD

At the motion to dismiss stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [p]laintiffs must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that determination, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That is so,

however, only as to factual allegations. The Court need not accept as true a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 546–47. Under the *Iqbal/Twombly* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a threshold level of factual plausibility before defendants are subjected to the potential rigors (and costs) of the discovery process. Discovery, after all, is not meant to allow a plaintiff to discover *whether* he or she has a claim, but to provide a process for discovering evidence to substantiate an already plausibly-stated claim. Accordingly, "bare allegations without any reference to the who, what, where, when, how or why" will not survive a motion to dismiss. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (internal quotation marks omitted). There is also an exception to the general principle that the Court accepts all factual allegations as true for internally inconsistent allegations, which need not (and indeed cannot) be accepted as true for purposes of a motion to dismiss. *Jiangbo Zhou v. Lincoln Electric Co.*, Case No.: 1:20-cv-00018, 2020 WL 2512865, at *4 (S.D. Ohio May 15, 2020).

As an alternative to granting Defendants' Motions to Dismiss, in whole or in part, the Secretary has suggested that this Court could instead grant him leave to amend the Amended Complaint. (*See* Resp. to Anthem, Doc. 39, #342). Under Fed. R. Civ. P. 15, a party may amend only with the opposing party's written consent (which

was not forthcoming here), or leave of the Court. As to the latter, although the question is committed to the trial court's discretion, the "court should freely give leave when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962). When assessing whether to grant leave, the Court should "consider whether there has been undue delay in filing, lack of notice to the opposing party, bad faith, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, or whether the amendment would be futile." *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990).

## LAW AND ANALYSIS

The parties advance various arguments about what ERISA requires of plan sponsors and claims adjudicators, both in terms of substance and disclosure, as to reimbursement methodologies. The Court does not reach most of those issues, however, as the Court concludes that the Secretary of Labor lacks authority to bring his claims challenging the reimbursement methodologies under either of the ERISA civil enforcement provisions that the Secretary cites as the basis for this authority. Specifically, the Secretary cannot bring those claims under 29 U.S.C. § 1132(a)(2) because he does not, and cannot, allege losses *to the Plan* as a result of the Defendants' actions, as required for an action pursuant to that civil enforcement provision. Separately, the Secretary lacks authority to bring the claims under 29 U.S.C. § 1132(a)(5) because he does not seek to prospectively enjoin an improper reimbursement methodology currently in use at the time of suit, but rather only to

recover benefits allegedly improperly withheld from Plan participants, a remedy that § 1132(a)(5) does not allow him to seek.

As for the TSWP, the Court finds that the Secretary plausibly states a claim that the TWSP was a discriminatory wellness program, in violation of 29 U.S.C. § 1182, during Plan Years 2011–2013. And, while the Court finds that the Secretary's Amended Complaint fails to include sufficient factual allegations to state a claim for a discriminatory wellness program for Plan Years 2014 and following, the Court will grant the Secretary leave to further amend his Amended Complaint in an effort to remedy this defect.

The Court agrees with Macy's, however, that the Amended Complaint does not allege breaches of fiduciary duty in connection with the TSWP for Plan Years 2011–2013 because Macy's was acting as a settlor determining which benefits its employees would receive rather than as a fiduciary managing Plan assets held in trust on behalf of its employees. Nevertheless, the Court cannot rule out the possibility that the Secretary could allege breaches of fiduciary duty on the basis of well-pled allegations regarding the TSWP for Plan Years 2014 and following, and therefore will allow the Secretary to further amend his Amended Complaint to allege such violations, if he can.

## A. The Secretary Lacks Statutory Authority To Bring The Claims Arising Out Of The Out-Of-Network Reimbursement Methodology.

ERISA is a "'comprehensive and reticulated statute'" whose civil enforcement provisions constitute an "interlocking, interrelated, and interdependent remedial scheme." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985) (quoting

*Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)). Importantly, ERISA's "comprehensive legislative scheme including an integrated system of procedures for enforcement" affords "strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Id.* at 147, 146 (quoting *Nw. Airlines, Inc. v. Transp. Workers*, 451 U.S. 77, 97 (1981)) (emphasis in original). Accordingly, courts should be "chary" of reading enforcement options into ERISA for which the statute's terms do not explicitly provide. *Id.* at 147 (quoting *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)). With these general interpretive principles in mind, the Court turns to the parties' arguments as to whether the Secretary may bring his claims related to the out-of-network reimbursement methodology under either 29 U.S.C. §§ 1132(a)(2) or (5).

### 1. The Secretary Fails To Allege Losses To The Plan As Required To Bring The Claims Under 29 U.S.C. § 1132(a)(2).

Section 1132(a)(2) allows the Secretary, among others, to bring an action "for appropriate relief under Section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 1109, in turn, provides for liability for "any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter." 29 U.S.C. § 1109(a). Any fiduciary found to be in breach must "make good to such plan any losses to the plan resulting from each such breach …." *Id.* Interpreting these provisions, the Supreme Court has considered that § 1132(a)(2) authorizes claims "brought in a representative capacity on behalf of the plan as a whole." *Russell*, 473 U.S. at 142 n.9. Consistent with that, the relief sought must "inure[] to the benefit of the plan as a whole." *Id.* at 140; *Pfahler v. Nat'l Latex*

15

*Prods. Co.*, 517 F.3d 816, 825 (6th Cir. 2007) ("Plaintiffs properly assert a claim under [§ 1132(a)(2)], as they seek to recover on behalf of the [p]lan …."). Courts in this circuit and district thus have looked for "losses to the plan" in considering whether a plaintiff can advance an action under § 1132(a)(2). *Adams v. Anheuser-Busch Cos., Inc.*, No. 2:10-cv-826, 2011 WL 1559793, at *8 (S.D. Ohio Apr. 25, 2011) ("Plaintiffs have alleged that the [p]lan's interpretation of [one of its provisions] was erroneous and that this interpretation constituted a breach of fiduciary duty which deprived them of benefits under the [p]lan, but have failed to allege facts showing that the interpretation resulted in losses to the [p]lan itself."). For example, § 1132(a)(2) is an appropriate avenue to pursue a claim for breach of fiduciary duty alleging that a fiduciary mismanaged or misappropriated the assets of a plan. *See, e.g.*, *Trs. of Ohio Bricklayers Health and Welfare Fund v. VIP Restoration, Inc.*, Case No. 1:17 CV 437, 2018 WL 931299, at *1, 3–4 (N.D. Ohio Feb. 16, 2018) (allegation that fiduciary used plan money "for the benefit of himself and his other companies"). In such situations, of course, the recovery would go back to the plan itself, at least in the first instance.

Here, though, the Secretary urges the Court to adopt a different reading of § 1132(a)(2)'s contours. The Secretary maintains he is *not* required to allege losses to the Plan in order to bring his claims under that provision. (Resp. to Anthem, Doc. 39, #317). After all, the Secretary says, § 1132(a)(2) allows him to seek "appropriate relief under Section 1109 of this title," and § 1109 provides that the breaching fiduciary "shall be subject to such other equitable or remedial relief as the court may deem appropriate." (Resp. to Anthem, Doc. 39, #318 (citing 29 U.S.C. §§ 1109(a) and

1132(a)(2))). From this combination, the Secretary gleans that he has authority to seek recovery beyond losses to the Plan, or disgorgement of the profits a fiduciary gained from misusing Plan assets. (*Id.*). According to the Secretary, so long as the requested relief calls for some kind of Plan-wide process, it matters not whether the dollars recovered under that process go to the Plan, or instead to Plan participants. (Resp. to Anthem, Doc. 39, #317).

Whatever might have been the merits of this reading of §§ 1109 and 1132(a)(2) as an original matter, this Court is not writing on a blank slate, and concludes that the Secretary's reading is foreclosed by the authorities discussed above. The Supreme Court has made it clear that the relief in a § 1132(a)(2) case "inures to the benefit of the plan as a whole." *Russell*, 473 U.S. at 140. Thus, losses to the plan are not merely one situation among many for which a claim under § 1132(a)(2) is available. Rather, losses to the plan (and not merely plan participants) are an essential predicate to any § 1132(a)(2) claim. *See id.*; *Pfahler*, 517 F.3d at 825. Given *Russell*'s language requiring that relief for such claims "inures to the benefit of the plan as a whole," this Court agrees with the other courts that have found that allegations of losses to the Plan itself are required to state a plausible claim for breach of fiduciary duty in a civil enforcement action pursuant to § 1132(a)(2). *Russell*, 473 U.S. at 140; *Pfahler*, 517 F.3d at 825; *Adams*, 2011 WL 1559793, at *8.

The Secretary cites various cases that he says support his alternate rule. A closer look at those cases, though, shows otherwise. For example, the Secretary cites a case from outside this circuit for the proposition that the Secretary "need not

demonstrate actual harm in order to have standing to seek injunctive relief requiring that [a defendant] satisfy its statutorily-created disclosure or fiduciary responsibilities." (Resp. to Anthem, Doc. 39, #318 (citing *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 456 (3d Cir. 2003))). But, as the quoted language shows, *Horvath* was about standing to pursue *injunctive* relief, and thus says little about § 1132(a)(2)'s scope. Moreover, the plaintiff in *Horvath* was a plan participant suing under § 1132(a)(3), which allows participants to seek equitable relief for violations of ERISA or of their health plans, not (a)(2). Thus, *Horvath* does not and could not support the Secretary's argument that the Secretary is not required to allege losses to the Plan in order to state a claim for relief under § 1132(a)(2).[2]

The Secretary also points to *Tullis v. UMB Bank, N.A.*, 515 F.3d 673 (6th Cir. 2008), as a case where the plaintiffs sought recovery of losses to their own pension plan accounts under § 1132(a)(2). But *Tullis* involved allegations of fraudulent activities on the part of an investment manager and therefore fits squarely within the paradigm of cases alleging losses to a plan. *Id.* at 674. In other words, in *Tullis*, the loss of money from the plaintiffs' individual accounts allegedly *resulted from* losses to the plan itself that occurred due to the alleged breaches of fiduciary duty. *Id.* Here, as discussed, the Secretary instead argues that he need not allege losses to the Plan at all, but may allege only losses to Plan participants without showing a linkage to any underlying loss to the Plan. (Indeed, here, it is quite possible that the

---

[2] It was not entirely clear from the Secretary's reply brief whether he was relying on *Horvath* as support for his ability to pursue a claim under § 1132(a)(2), or instead only injunctive relief under § 1132(a)(5). To the extent it was the latter, the Court addresses the shortcomings in the Secretary's claims for injunctive relief below. (*See* Part A.2, *infra*).

Plan may have benefitted insofar as the Plan avoided payments for which it would otherwise have been responsible.) *Tullis* does not support the Secretary's argument.

Finally, the Secretary cites the Sixth Circuit's rejection, in *Kuper v. Iovenko*, 66 F.3d 1447, 1453 (6th Cir. 1995) (citation and internal quotation marks omitted), of the argument that "a breach must harm the entire plan to give rise to liability," where the Sixth Circuit further noted that "[s]uch a result clearly would contravene ERISA's imposition of a fiduciary duty that has been characterized as the highest known to law." (Resp. to Anthem, Doc. 39, #320). But the distinction in *Kuper* was between those losses to a plan that harm "all of a plan's participants," versus those losses that harm only some of them. *Kuper*, 66 F.3d at 1453. The Sixth Circuit found that the latter sufficed, so that the plaintiff could rely on harm to only a portion of the plan, rather than the "entire plan." *Id.* But, here, once again, the Secretary argues that he need not allege losses to the Plan *at all* in order to bring suit under § 1132(a)(2). Like the other cases the Secretary cites, *Kuper* does not support this proposition. Thus, the Secretary cites, and the Court is aware of, no legal support for his contention that he need not allege losses to the Plan in order to pursue a claim under § 1132(a)(2).

In the alternative, the Secretary argues that even if he is required to allege losses to the Plan, he has done so here in three ways. First, the Secretary argues that "the inference of losses is clear from the Complaint's factual allegations ... because, in some instances, Plan participants would receive a smaller benefit under [Defendants'] cost-based adjudication." (Resp. to Anthem, Doc. 39, #318). Second, the

Secretary appears to argue the opposite in the alternative, namely that the reimbursement methodology "caused the Plan to improperly *overpay* participants." (*Id.* at #319) (emphasis added). Third, the Secretary argues that the improper reimbursement methodology has created a need for re-adjudication and that the costs incurred in conducting such a re-adjudication will represent losses to the Plan. (*Id.*).

In assessing these arguments, the Court first considers what, as a matter of law, would count as losses to the Plan, and then asks whether the Amended Complaint (Doc. 4) alleges or renders plausible an inference that the Plan has suffered such losses. So examined, the Secretary's first theory, based on underpayment of benefits, fails as a matter of law. As Anthem notes, courts in this circuit and district have determined that "[a] plan that offers fewer benefits to its participants has not 'lost anything, and in fact may have its assets increase as a result of smaller payout amounts.'" *Adams*, 2011 WL 1559793, at *7 (S.D. Ohio Apr. 25, 2011) (quoting *Jones v. Blue Cross Blue Shield of Mich.*, No. 2:08-cv-12272, 2009 WL 646636, at *7 (E.D. Mich. Mar. 10, 2009)). The Court sees no reason to depart from this logic, which takes seriously the principle that the relief sought in an action under § 1132(a)(2) must be relief for the plan. If underpayment of benefits constituted losses to the plan, § 1132(a)(2) would allow plaintiffs, including the Secretary of Labor, to bring a claim whenever a fiduciary allegedly underpaid benefits pursuant to plan documents. This would "tamper with" Congress's decision to allow "a participant or beneficiary," but not the Secretary of Labor, to bring an action to recover benefits. *See Russell*, 473 U.S. at 147; 29 U.S.C. § 1132(a)(1)(B).

True, the operative Amended Complaint (Doc. 4) in this action alleges that Macy's responsibility to the Plan "equaled the amount by which the Health Plan's claims and administrative expenses exceeded all participant contributions …." (Am. Compl., Doc. 4, ¶ 40, #55). This renders plausible an inference that underpayment of benefits from the Plan in turn led to less funding to the Plan from Macy's. But this, at most, would seem to suggest that the net impact on the Plan of Defendants' alleged violations of their fiduciary duties was neutral, rather than giving rise to a plausible inference of *losses* to the Plan resulting from the Defendants' conduct. Thus, as a matter of law, any underpayment of benefits by Defendants does not in itself represent losses to the Plan allowing suit under § 1132(a)(2).

On the other hand, the Secretary's half-hearted attempt to reverse the logic and allege overpayment of benefits doesn't work because the allegations in the Amended Complaint (Doc. 4) do not support it. As the Secretary spends much of his own briefing arguing, to the extent that the Amended Complaint supports any inference at all about the net impact of the change in methodology on reimbursement for out-of-network care, the inference would be that the change resulted in *lower* benefit payouts. (*See* Resp. to Cigna, Doc. 40, #340 (arguing that "[i]t is reasonable to infer from the facts alleged in the Complaint that [Defendants] knew using the cost methodology employed by Medicare to lower reimbursements would result in lower reimbursement rates for out-of-network claims")). For one thing, the relief requested in the Amended Complaint includes a re-adjudication "to restore to participants all amounts they were required to pay pursuant to the Plan documents that are greater

than what was paid in operation plus interest." (Am. Compl., Doc. 4, #74). Perhaps unsurprisingly, there is no mention of requiring Plan participants to reimburse the Plan for instances in which the Plan overpaid participants.

Moreover, the Court concludes that this is not a mere pleading defect for which leave should be granted to further amend the Amended Complaint. Rather, the underlying, and insurmountable, problem is the legal incongruity between the kind of relief (namely relief to the Plan) required to support a claim under § 1132(a)(2) and the kind of relief (namely relief to Plan participants independent of any loss to the Plan) that the Secretary seeks here. While the Secretary may argue in the alternative, he is not entitled to the benefit of inferences that contradict his factual allegations and the relief he requests. *Cf. Jiangbo Zhou*, 2020 WL 2512865, at *4 (internally inconsistent allegations failed to state claim).

Finally, the Secretary's suggestion that the expenses of re-adjudication themselves would constitute losses to the Plan supporting suit under § 1132(a)(2) is fatally circular. The Secretary asserts that "[t]he Defendants' fiduciary breaches have caused the need for the re-adjudication of claims," but fails to substantiate why this "need" arises other than as a hypothetical consequence of the ultimate success of the Secretary's claims. (Resp. to Anthem, Doc. 39, #319). In other words, the Secretary seeks to use the cost of one of his desired *remedies* in the event his claims are successful—namely the potential future expenses incurred in the re-adjudication that he claims will be necessary if he wins—to satisfy a *prerequisite* to bringing the claims, namely a past or current injury in the form of losses to the Plan. The Secretary cites

22

no authority, and the Court has located none, for the proposition that an ERISA plaintiff, or indeed any plaintiff, may go back to the future in this way. The Court therefore rejects the Secretary's argument that he may rely on hypothetical, as-yet-unincurred future losses to the Plan, arising from a potential re-adjudication that may result from this lawsuit, to establish his ability to bring the claims at issue under § 1132(a)(2) in the first instance.

Because the Secretary is required to allege past or current (or at least imminent) losses to the Plan to bring a suit under 29 U.S.C. § 1132(a)(2), but does not and cannot allege such losses, the Secretary may not use that provision to advance his claims here. And because the problem stems fundamentally from the nature of the alleged violations and the kind of relief the Secretary is seeking, rather than mere lack of sufficient detail in the Amended Complaint, the Court concludes that any further amendment to the Amended Complaint with respect to this issue would be futile. Put another way, the allegations of the Amended Complaint not only fail to support, but in fact contradict, the availability of § 1132(a)(2) as an avenue to bring this suit. *See Jiangbo Zhou,* 2020 WL 2512865, at *4. The Court therefore denies the Secretary leave to further amend his Amended Complaint to plead losses to the Plan so as to bring suit under § 1132(a)(2). *See Gen. Elec. Co.*, 916 F.2d at 1130 (denial of leave to amend appropriate where amendment would be futile).

23

**2.      The Secretary Fails To Allege A Current Improper Reimbursement Methodology As Required To Bring The Claims Under 29 U.S.C. § 1132(a)(5).**

Section 1132(a)(5) allows the Secretary to bring a "civil action … (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter …." 29 U.S.C. § 1132(a)(5). The Secretary claims that the relief he seeks here falls within the ambit of this provision. Macy's disagrees. So does the Court.

Resolving that dispute requires a two-step process. That is in part because there is not much Sixth Circuit case law interpreting the contours of 29 U.S.C. § 1132(a)(5). The parties seem to agree, however, that it is appropriate to fill that void by reference to 29 U.S.C. § 1132(a)(3), a nearby portion of the same statute, as to which the Sixth Circuit has provided greater guidance. (*Compare* Anthem Mot., Doc. 38, #292 n.8 *with* Resp. to Anthem, Doc. 39, #321 n.4). "A standard principle of statutory construction provides that identical words ... within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). Here, the two provisions at issue sit nearly side-by-side in the same statute in the United States Code. The earlier one, § 1132(a)(3), outlines the rights of plan participants or beneficiaries to seek injunctive or other equitable relief for an ERISA violation or plan violation. The latter one, § 1132(a)(5), by contrast, outlines the Secretary's right to seek injunctive or other equitable relief for an ERISA violation. To be sure, there is one difference—plan participants have the ability to seek such relief for plan violations, in addition to ERISA violations,

24

while the Secretary is limited to the latter. But beyond that the two provisions are word-for-word identical. Under settled canons of statutory construction, then, the references to "enjoin[ing] any act … which violates a provision of this subchapter," or "obtain[ing] other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter …", *see* 29 U.S.C. §§ 1132(a)(3) and (a)(5) (identical as to quoted language), should be understood the same way in each sub-section. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260 (1993).

Sixth Circuit precedent establishes the scope of this language under § 1132(a)(3), and the line that precedent draws precludes the Secretary from using § 1132(a)(5) to obtain the relief that he seeks here. Under Sixth Circuit case law, a plan participant cannot seek equitable relief under § 1132(a)(3) if the claim the plan participant is asserting amounts only to a claim for benefits, which is the case wherever there is no separate injury apart from denial of benefits. *See Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 375 (6th Cir. 2015). Rather, the sole remedy for such claims (i.e., a claim seeking wrongly denied benefits) is an action under 29 U.S.C. § 1132(a)(1)(b) to "recover benefits due to" the plan participant. *Id.*

Participants have sometimes tried to skirt this rule through creative pleading. They argue, for example, that they are seeking "disgorgement," which is a form of equitable relief, and which thus (they say) should be available under § 1132(a)(3). *See id.* at 375. Or they argue that a claim for plan-wide relief is more than a claim for denial of benefits under § 1132(a)(1), and thus should be allowed to proceed under § 1132(a)(3). *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 492 (6th Cir. 2009).

25

The Sixth Circuit, though, has endeavored to draw a consistent line. If a plaintiff is seeking backward-looking relief for alleged violations of the plan that resulted in allegedly wrongful denial of benefits, and cannot identify any injury apart from such denial, then the claim does not arise under § 1132(a)(3), but rather under § 1132(a)(1)(b). *See Rochow*, 780 F.3d at 375; *Tackett*, 561 F.3d at 492. It is only if there are *ongoing* plan violations that threaten *future* harm that an action under § 1132(a)(3) may arise based on a claim that a plan did not follow an appropriate reimbursement methodology under its governing documents. *See Hill v. Blue Cross and Blue Shield of Mich.*, 409 F.3d 710, 718 (6th Cir. 2005) ("In this case, an award of benefits to a particular Program participant … will not change the fact that [the defendant] *is using* an allegedly improper methodology …. Only injunctive relief … will provide the complete relief sought … by requiring [the defendant] to alter the manner in which it administers all the [p]rogram's claims ….") (emphasis added).

And that dividing line makes some sense. To be sure, a court order requiring a company to recalculate past benefits at a plan participant's behest, that will result in a payment of greater benefits for the past events at issue, perhaps could be characterized as a form of injunctive relief—after all, the court is ordering the company to engage in particular conduct (i.e., the recalculation) in the future. But, as a matter of substance, such relief is really a form of damages (i.e., legal relief), as the remedy results in a dollar payment for a past wrong (i.e., the past wrongful denial of benefits). The mere fact that the company must calculate what those damages are, as a step in paying them, does not transform this legal remedy into an equitable one.

26

Thus understood, the Secretary's claim here falls on the wrong side of the dividing line. The Secretary does not allege that the Defendants' current practices continue to reflect the same allegedly improper reimbursement methodology as in the period at issue in the claims arising from the out-of-network reimbursement methodology. Thus, the Secretary's claim for relief does not seek to prevent future harms as to benefit decisions that the Plan has not yet made. Rather, the sole relief that the Secretary seeks here is a backward-looking re-calculation of certain benefit decisions that the Plan made in the past, with a view that this re-calculation will result in Plan participants receiving more money in connection with those past claims. Under Sixth Circuit precedent, such relief would not fall within § 1132(a)(3), and thus does not fall within the same language in § 1132(a)(5).

One last observation—the context surrounding the two statutory provisions is different in one regard that is arguably important to the interpretive issue here. When considering § 1132(a)(3), the question is whether a plan participant can pursue a particular action under that subsection, or instead must bring it under § 1132(a)(1)(b). That is, a plan participant can bring claims either (1) for wrongful denial of benefits (under (a)(1)(b)), or (2) for injunctive relief (under (a)(3)). The Secretary, by contrast, does not have the same menu of options. Thus, the sorting rule that applies to differentiate (a)(1)(b) claims from (a)(3) claims is not necessary in the (a)(5) context, and precedent interpreting the outer limits of (a)(3) may not be directly applicable to defining the contours of (a)(5). The Court concludes, however, that the substantial identity of the statutory text between the two sections (i.e., (a)(3)

and (a)(5)) outweighs any such context-driven argument. And, in any event, the foregoing description may overstate the contextual difference. While it is true that the Secretary lacks the power to bring a claim for wrongful denial of benefits, the Plan participants can. Thus, the same sorting concerns may apply, at least indirectly, even in the context of an action by the Secretary. Moreover, the parties to the instant case do not appear to disagree that precedent interpreting (a)(3) also governs the issue under (a)(5), and the Court is reluctant to rely on possible bases for distinction between the two provisions that the parties themselves have not raised or discussed.

As before, the Court could perhaps allow the Secretary leave to amend further his Amended Complaint to see whether he could allege that the improper methodology is current and ongoing. The Court again concludes, however, that not only does the Amended Complaint fail to allege such a methodology, but that the factual allegations in the Amended Complaint affirmatively contradict the idea that the improper methodology it alleges was continuing at the time of suit. Specifically, all of the Secretary's factual allegations in the Amended Complaint with respect to the out-of-network reimbursement methodology concern a period that extended only through June 30, 2012. (*See, e.g.*, Am. Compl., Doc. 4, #59). To be sure, the Amended Complaint does not expressly allege that Defendants amended the Health Plan documents on July 1, 2012, such that their reimbursement methodology was no longer in violation of the documents. But that is the inescapable conclusion from the factual allegations in the Amended Complaint. Because the Amended Complaint already establishes that the allegedly improper reimbursement methodology at issue

ended on July 1, 2012, it would be futile to allow the Secretary to further amend the Amended Complaint to allege that the same improper reimbursement methodology was in use at the time of suit. *See Gen. Elec. Co*, 916 F.2d at 1130 (denial of leave to amend appropriate where amendment would be futile); *Jiangbo Zhou*, 2020 WL 2512865, at *4 (internally inconsistent allegations fail to state claim). Thus, the Court will not grant the Secretary leave to further amend his Amended Complaint to allege a current improper reimbursement methodology.

Because the Secretary lacks legal authority to bring claims related to the out-of-network reimbursement methodology under either 29 U.S.C. §§ 1132(a)(2) or (a)(5), the Court **GRANTS** Cigna's and Anthem's Motions to Dismiss (Docs. 36, 38) in their entirety and also **GRANTS** Macy's Motion to Dismiss (Doc. 37) with respect to those claims. Because the allegations of the Amended Complaint are not merely factually deficient but legally inconsistent with entitlement to relief under either civil enforcement provision, it would be futile to allow amendment of the Amended Complaint (Doc. 4) with respect to these claims. Accordingly, the Court **DENIES** leave to amend the Amended Complaint (Doc. 4) with respect to the claims arising from the out-of-network reimbursement methodology. The Court therefore **DISMISSES WITH PREJUDICE** all of the Secretary's claims against Cigna and Anthem, as well as the Secretary's claims against Macy's in connection with the out-of-network reimbursement methodology.

29

**B.     The Secretary States A Claim That The TSWP Was A Discriminatory Wellness Program In Plan Years 2011–2013 And Has Leave To Properly Plead Violations For Subsequent Years.**

ERISA prohibits discrimination against individual plan participants and beneficiaries based on health status at 29 U.S.C. § 1182. But that provision contains an exception for "establishing premium discounts or rebates … in return for adherence to programs of health promotion and disease prevention." 29 U.S.C. § 1182(b)(2). As is often the case, the federal regulation applicable to such "wellness programs" has been revised from time to time, and in this instance was updated in 2013. As relevant here, the pre-2013 version of the regulation is the one that applied to the Plan Years at issue here prior to Plan Year 2014, while the 2013 version applied to all subsequent Plan Years. *See* 78 Fed. Reg. 33158-01, 2013 WL 2368971, at *33158 ("This section is applicable to group health plans and health insurance issuers offering group health insurance coverage for plan years beginning on or after January 1, 2014.").

Under the regulations applicable in Plan Years 2011–2013, there are two kinds of wellness programs: programs that condition receipt of the "reward" (defined to include avoiding a penalty) on "satisfying a standard that is related to a health factor," and programs that do not. 29 C.F.R. § 2590.702(f) (Dec. 13, 2006). Under the regulations applicable in Plan Years 2014 and following, the second, "health-contingent" category is further broken into two subcategories, such that there are three total possibilities: (1) participatory wellness programs, where the reward is available to anyone who joins the program, without requiring either any specific health-related activities or any specific health outcomes (e.g., a program that

30

reimburses any employee who purchases a gym membership, without regard for whether the employee ever goes to the gym); (2) activity-only wellness programs, which provide the reward to anyone who engages in a particular activity (e.g., exercise) without requiring a specific health outcome; and (3) outcome-based wellness programs, which tie receipt of the reward to achieving a specific health status or outcome (e.g., a particular body-mass index). *See generally* 29 C.F.R. § 2590.702(f).

Under both versions of the regulation, all wellness programs must afford the reward to all "similarly situated individuals." *Compare* 29 C.F.R. § 2590.702(f)(2)(iv) (Dec. 13, 2006) *with* 29 C.F.R. §§ 2590.702(f)(3)(iv), (f)(4)(iv). It is up to the employer to determine, at least in the first instance, what constitutes "similarly-situated individuals." But, in making that determination, employers cannot rely on health-related criteria. Rather, they must rely solely on bona fide employment-based categorizations (for example, differentiating between an employer's employees, as opposed to the employees' dependents, or between the employer's line employees, on the one hand, and its managerial employees, on the other). *See generally* 29 C.F.R. § 2590.702(d). To comply with the requirement that the reward be available to all similarly-situated individuals, a health-contingent wellness program also must provide a "reasonable alternative standard" for those individuals for whom it would be either unreasonably difficult due to a medical condition or medically inadvisable to achieve the primary health outcome in question. 29 C.F.R. §§ 2590.702(f)(2)(iv)(A)(1)–(2) (Dec. 13, 2006); 29 C.F.R. §§ 2590.702(f)(3)(iv)(A)(1)–(2), (f)(4)(iv)(A). So, for example, the current regulations provide that a reasonable

alternative to achieving a particular specified body-mass index ("BMI"), say, a BMI of 25 or less, would be instead achieving a certain small percentage reduction in an employee's BMI over a reasonable period of time. *Id.* at § 2590(f)(3)(iv)(D)(1).

Another possibly significant difference between the wellness program regulations applicable in Plan Years 2011–2013 and those applicable in Plan Years 2014 and following consisted in the addition of an adjective: the pre-2013 regulation stated that "the reward" for a health-contingent wellness program must be available to all similarly-situated individuals, while the 2013 version instead provided that "the *full* reward" for the activity- or outcome-based wellness program must be available to all similarly-situated individuals. *Compare* 29 C.F.R. § 2509.702(f)(2)(iv) (Dec. 13, 2006) *with* 29 C.F.R. §§ 2509.702(f)(3)(iv), (f)(4)(iv) (emphasis added).

The Secretary asserts claims related to the TSWP for every Plan Year since 2011. Nevertheless, the alleged factual bases for these claims vary. For Plan Years 2011 and 2012, the Secretary alleges that Macy's failed to provide any reasonable alternative standard for individuals for whom it was unreasonably difficult due to a medical condition or medically inadvisable to cease using tobacco products, and also that Macy's failed to notify individuals of the possibility of completing a reasonable alternative standard. For Plan Year 2013, while the Secretary appears to acknowledge that pertinent Plan documents both disclosed and made available a reasonable alternative standard, the Secretary argues that the TSWP did not meet the applicable legal requirements because those Plan documents expressly stated that Macy's would not provide retroactive reimbursement of the full annual Tobacco

Surcharge to individuals who completed the reasonable alternative standard at some point during the Plan Year. For Plan Years 2014 to the time the Complaint was filed, the Secretary does not cite any Plan documents that expressly state that the full annual Tobacco Surcharge would not be retroactively reimbursed, but instead alleges on information and belief that at least some individuals who completed a reasonable alternative standard did not receive a refund of the full Tobacco Surcharge for the corresponding Plan Year.

As described below, the Court concludes that the Secretary states a claim with respect to Plan Years 2011, 2012, and 2013. With respect to Plan Years 2014 and following, the Secretary's Amended Complaint lacks sufficient factual allegations to state a claim. Because the Secretary potentially could rectify this pleading defect by presenting more detailed factual allegations, however, the Secretary has leave to further amend his Amended Complaint to state a claim for a discriminatory wellness program with respect to Plan Years 2014 and following.

### 1. The Secretary States A Claim With Respect To Plan Years 2011 and 2012.

Under the legal standards discussed above, the Court concludes that the Secretary states a claim that Macy's violated ERISA when it maintained a wellness program that required participants and beneficiaries to swear that they were tobacco-free by a certain date in order to avoid paying the Tobacco Surcharge. For example, with respect to Plan Year 2011, the Secretary's Amended Complaint alleges that Macy's offered a "one-time opportunity to avoid the Tobacco Surcharge" by informing the Plan prior to September 22, 2011, that a tobacco user would join a tobacco

33

cessation program, and then returning an affidavit between April 1, 2012, and May 1, 2012, certifying that the individual had been tobacco-free for six months. (Am. Compl., Doc. 4, #64). Under the standards discussed above, a program requiring Plan participants to become tobacco-free within six months or face a penalty is a wellness program requiring them to satisfy a standard related to a health factor. 29 C.F.R. § 2590.702(f) (Dec. 13, 2006). The Amended Complaint alleges that Macy's did not provide a reasonable alternative to this health-factor-related standard for individuals for whom it was either unreasonably difficult due to a medical condition or medically inadvisable to meet the standard. *Id.* Specifically, the Amended Complaint alleges that even individuals who entered a tobacco cessation program were still required to pay the Tobacco Surcharge unless they met the requirements described above, which included swearing they had been tobacco-free for six months. *Id.* at #65. Because no reasonable alternative standard was available, there also was no required disclosure of the availability of a reasonable alternative standard to Health Plan participants. *Id.* That is enough to state a claim for a discriminatory wellness program in violation of 29 U.S.C. § 1182 and C.F.R. § 2590.702 because the Secretary alleges (1) a wellness program where the reward was conditioned on satisfying a standard related to a health factor, that (2) failed to provide a reasonable alternative standard for those individuals for whom it was either unreasonably difficult or medically inadvisable to achieve the primary standard (cessation of use of tobacco products).

The same analysis applies to Plan Year 2012. The Secretary alleges that during that year, "the only method" to avoid the Tobacco Surcharge "included declaring" that

an individual "remained tobacco free for a period of six consecutive months." *Id.* at #67. The Secretary again alleges that there was no notice of the availability of any reasonable alternative standard (because the TSWP did not allow for a reasonable alternative standard). *Id.* Thus, the Secretary alleges a wellness program whose reward was conditioned on satisfying a standard related to a health factor that did not provide an appropriate reasonable alternative standard. Macy's assertion, without elaboration, that the Secretary's Amended Complaint pleads insufficient facts to put Macy's on notice of the nature of the Secretary's claim is therefore without merit. (*See* Macy's Mot., Doc. 37, #190, 192). The Secretary provides detailed information about the alleged timeline of events through which tobacco users were required to meet a set of criteria (including becoming tobacco-free) by a specific deadline in order to avoid the Tobacco Surcharge. (Am. Compl., Doc. 4, ¶ 91, #64).

Beyond the asserted lack of specificity, Macy's also argues that the Secretary's claims should be dismissed for another reason. According to Macy's, the Amended Complaint is "arguing that Macy's did not present an alternative that practically speaking does not exist and that no doctor would ever support." (Macy's Mot., Doc. 37, #191). But that is a factual argument, and thus does not support dismissal under Rule 12(b)(6). In other words, Macy's is arguing that to cease tobacco use is never either (1) unreasonably difficult due to a medical condition, or (2) medically inadvisable. But Macy's points the Court to no authority holding, as a matter of law, that this is the case. On the contrary, the applicable regulation explicitly contemplates "nicotine addiction" as a medical condition that could make it

35

unreasonably difficult for an individual to stop smoking. *See* 29 C.F.R. § 2590.702(f)(2)(v)(3)(Example 5)(i) (Dec. 13, 2006). In any event, dismissal of the Secretary's claims based on that argument at this juncture would be premature. If Macy's can establish as a matter of undisputed fact that there is never a situation where it is unreasonably difficult due to a medical condition or medically inadvisable to cease tobacco use, summary judgment may well be appropriate. But that is a question for another day.

Macy's also incorrectly asserts that the Secretary fails to allege that Macy's did not provide a reasonable alternative, and instead only alleges a notice violation. (*Id.*). This argument is without merit. As discussed, the Secretary alleges both failure to provide a reasonable alternative and failure to provide notice of such an alternative. (*See* Am. Compl., Doc. 4, #64, 67).

Because the Secretary has pled sufficient facts to allege a plausible violation of 29 U.S.C. § 1182 for the 2011 and 2012 Plan Years, and because Macy's fails to establish that the Secretary's claims fail as a matter of law, the Court **DENIES** Macy's Motion to Dismiss (Doc. 37) with respect to the Secretary's claims for a discriminatory wellness program during Plan Years 2011 and 2012.[3]

---

[3] It appears that Macy's may also be arguing, at least in passing, that the Secretary lacks statutory authority to assert claims for alleged violations of 29 U.S.C. § 1182. (*See* Macy's Mot., Doc. 37, #199). To the extent Macy's is pressing that argument, the Court rejects it. Rather, the Court finds that the Secretary has such authority under 29 U.S.C. § 1132(a)(5). *Cf. DaVita, Inc. v. Marietta Mem'l Hosp. Emp. Health Benefit Plan*, 978 F.3d 326, 347 (6th Cir. 2020) (noting that § 1132(a)(3), which as noted above has substantially identical wording to (a)(5), allows suit for violation of § 1182) *cert. granted to consider other issues by DaVita, Inc. v. Marietta Mem'l Hosp. Emp. Health Benefit Plan*, No. 20-1641, 2021 WL 5148066, at *1 (2021); *Stang v. Clifton Gunderson Health Care Plan*, 71 F. Supp. 2d 926, 933 (W.D. Wis. 1999) (same). Relatedly, to the extent that Macy's argues that the Secretary has failed to

### 2.    The Secretary States A Claim With Respect to Plan Year 2013.

Unlike Plan Years 2011 and 2012, during which the Secretary alleges that Macy's provided neither a reasonable alternative standard nor notice of such a standard, the Amended Complaint acknowledges that, in Plan Year 2013, Macy's gave Plan participants notice that it would provide a reasonable alternative standard for individuals for whom such a standard would be appropriate according to the ERISA statutory and regulatory provisions at issue. (*See* Am. Compl., Doc. 4, ¶ 108(a), #69). Nevertheless, the Secretary alleges that Macy's violated ERISA by stating that it would not provide retroactive reimbursement of the full Tobacco Surcharge for the entire year for all individuals who completed the reasonable alternative standard at some point during the year. (*Id.* at ¶ 108(b), #69). In support of this allegation, the Secretary excerpts the Tobacco Affidavit in effect for that year, which states that "the tobacco surcharge will not be changed retroactively and no refunds or credits will be issued." (*Id.*). Macy's argues that the regulations then in effect did not require it to reimburse such individuals for the entire year. (Macy's Mot., Doc. 37, #192; Macy's Reply, Doc. 44, #412). At this juncture, the Court concludes that the Secretary's claim does not fail as a matter of law.

In arguing that the pre-2013 ERISA regulation prohibiting discriminatory wellness programs did not require Macy's to reimburse the full Tobacco Surcharge,

---

allege harm to Plan participants as required for equitable relief, that argument is likewise without merit. (Macy's Mot., Doc. 37, #199; Macy's Reply, Doc. 44, #420). The Amended Complaint alleges that Macy's discriminatory wellness program directly harmed Plan participants by requiring them to make Tobacco Surcharge payments that they should have had the opportunity to avoid by completing a reasonable alternative standard. (Doc. 4, ¶¶ 95, 102, #65, 67).

Macy's relies heavily on the regulatory evolution in which the term "reward" in the earlier version of the regulation was replaced by "full reward" in the subsequent 2013 version. *Compare* 29 C.F.R. § 2509.702(f)(2)(iv) (Dec. 13, 2006) *with* 29 C.F.R. § 2509.702(f)(3)(iv), (f)(4)(iv). That is, all seem to agree that the later version of the regulation would require a refund of the entire annual amount for anyone who completes the reasonable alternative standard at any point during the year. (*See* Macy's Mot., Doc. 37, #193 ("the regulatory history demonstrates that this requirement did not apply *until the 2014 Plan Year*") (emphasis added)). But, according to Macy's, the lack of the word "full" in the pre-2013 regulation is an indication that the pre-2013 regulation meant that Macy's was free to offer a partial reward by merely discontinuing the charge on a going-forward basis once the reasonable alternative standard was met, rather than offering a refund for amounts already collected. (Macy's Mot., Doc. 37, #192; Macy's Reply, Doc. 44, #412). The Secretary, by contrast, argues that the addition of the word "full" was a mere clarification of the earlier regulation. (Resp. to Macy's, Doc. 41, #360).

The Court concludes that the addition of the word "full" to the version of the regulation applicable to Plan Years 2014 and later is too slim a reed to support the weight of Macy's argument, at least at this stage of the proceedings, and on the somewhat nebulous factual allegations here. The pre-2013 version of the regulation required Macy's to provide an alternate mechanism for Plan participants to receive "the reward" "for a period." 29 C.F.R. § 2590.702(f)(2)(iv)(A) (Dec. 13, 2006). The "reward" that non-smoking Plan participants receive is the right not to pay the

Tobacco Surcharge for the entire year. Thus, one could see the argument that making "the reward" available "for a period" (e.g., a plan year) for those employees who qualify by means of a reasonable alternative standard would likewise require reimbursement of any monthly Tobacco Surcharge already paid during that period. *See id*. In other words, if the appropriate comparator group is Plan participants who have "satisf[ied] the otherwise applicable standard [i.e., not using tobacco products]" for the entire year, then that group has not paid *any* Tobacco Surcharge. Thus, to put those employees who have completed the reasonable alternative standard at some point during the year into that same position would require a refund of previous surcharges paid during that plan year.

Alternatively, another potential comparator group is those employees who have ceased using tobacco products during the year. (*See* Macy's Reply, Doc. 44, #413–14). In that event, the factual question would be how Macy's treats those employees: do they receive a full-year refund, or instead only prospective relief from ongoing surcharge payments? Assuming those employees only receive prospective relief, as Macy's seems to suggest in its briefing, then two further legal questions arise: (1) whether that treatment of employees who quit using tobacco products mid-year itself satisfies ERISA; and (2) what implications that treatment of those employees has for the employees who complete the reasonable alternative standard (but do not quit using tobacco products) at some point during the year. Macy's appears to assume without argument that ending the Tobacco Surcharge on a going-forward basis is enough to satisfy ERISA with respect to the employees who actually quit smoking

mid-year, while the Court cannot quite discern the Secretary's position regarding that category of employees. (*See id.*; *see also* Am. Compl., Doc. 4, ¶ 107, #69 (referring to "Health Plan participants who entered one of Macy's tobacco cessation programs *in an attempt to quit using tobacco products*") (emphasis added)). Macy's also appears to assume that the regulation should not be interpreted to treat individuals who actually cease using tobacco products mid-year worse than individuals who complete the reasonable alternative standard at some point during the year, but Macy's legal support for that proposition is unspecified. (Macy's Mot., Doc. 37, #193; Macy's Reply, Doc. 44, #413–14). The Court further notes that, to the extent that less favorable treatment of individuals who actually stop using tobacco products mid-year than individuals who complete the reasonable alternative standard mid-year but do not quit using tobacco products would be troublesome, that same discrepancy may well obtain in the current version of the regulation, which Macy's seems to agree requires retroactive reimbursement of individuals who complete the reasonable alternative standard mid-year for Plan Years 2014 and following, even if they do not stop using tobacco products. In the absence of more fulsome treatment of these various factual and legal issues by the parties, the Court is not presently in a position to decide, as a matter of law, that the Secretary's allegations do not state a claim.

   In addition to the issues related to the appropriate comparator group, there is also another separate timing question. Here, the reasonable alternative standard (e.g., the tobacco cessation program) may take time to complete, raising the question of whether Plan participants should be deemed to have achieved the reasonable

alternative standard as of the time they *begin* to fulfill its requirements (assuming they eventually complete all of the requirements), or only as of the time they *complete* the requirements of the reasonable alternative standard. An example from the applicable pre-2013 regulation may provide some guidance here:

> In conjunction with an annual open enrollment period, a group health plan provides a form for participants to certify that they have not used tobacco products in the preceding twelve months. Participants who do not provide the certification are assessed a surcharge that is 20 percent of the cost of employee-only coverage. However, all plan materials describing the terms of the wellness program include the following statement: "If it is unreasonably difficult due to a health factor for you to meet the requirements under this program (or if it is medically inadvisable for you to attempt to meet the requirements of this program), we will make available a reasonable alternative standard for you to avoid this surcharge." It is unreasonably difficult for individual F to stop smoking cigarettes due to an addiction to nicotine, a medical condition. The plan accommodates F by requiring F to participate in a smoking cessation program to avoid the surcharge. F can avoid the surcharge *for as long as F participates in the program*, regardless of whether F stops smoking (so long as F continues to be addicted to nicotine).

29 C.F.R. § 2590.702(f)(2)(v)(3)(Example 5)(i) (Dec. 13, 2006) (emphasis added). The Secretary alleges that during Plan Year 2013, "Health Plan participants who entered one of Macy's tobacco cessation programs in an attempt to quit using tobacco products were still required to pay the Tobacco Surcharge." (Am. Compl., Doc. 4, ¶ 107, #69). The Secretary also alleges that such participants were told they would receive no refunds (and thus inferentially alleges that they in fact did not receive such refunds). (*Id.* at ¶ 108(b), #69). While not conclusive, the above example from the applicable pre-2013 regulation provides some legal support for the proposition that Macy's was required to cease the Tobacco Surcharge (or retroactively reimburse it) for Plan

41

participants "as long as" they were participating in a tobacco cessation program as part of the reasonable alternative standard (at least where the individual eventually completed all the requirements of the reasonable alternative standard). Thus, assuming there were individuals who undertook to meet a reasonable alternative standard involving tobacco cessation courses, completed all the requirements of that reasonable alternative standard at some point during the Plan Year, but did not receive refunds of Tobacco Surcharges assessed while they were in the process of completing the reasonable alternative standard, the Secretary has stated a plausible claim that such individuals would be entitled to relief (which is not to say, of course, that the claim will necessarily prevail on the merits).

In short, at present the Secretary has pled sufficient facts to put Macy's on notice of the nature of his claim regarding the 2013 TSWP, and there is sufficient factual and legal uncertainty that the Court cannot conclude that Macy's will prevail on its defense against that claim as a matter of law, at least not in its entirety. Accordingly, the Court **DENIES** Macy's Motion to Dismiss (Doc. 37) with respect to the claim that the TSWP was a discriminatory wellness program during Plan Year 2013.

**3. The Secretary Fails To State A Claim With Respect To Plan Years 2014 And Following, But May Amend The Complaint To Do So.**

In support of its allegations concerning Plan Years 2014 and following, the Secretary's Amended Complaint excerpts the Tobacco Affidavit in effect for those years. (Am. Compl., Doc. 4, ¶ 114, #72). That Affidavit offers signatories an option to

certify that they and all "enrolled dependents who are not Tobacco Free have completed a reasonable alternative standard for the current plan year to avoid the Tobacco Surcharge for the current plan year." (*Id.*). Signatories who select this option must then further certify that they are either (1) still tobacco users, or (2) "Tobacco Free and/or no longer using Tobacco products and working towards Tobacco Free status." (*Id.*). The Amended Complaint then characterizes this same Tobacco Affidavit as "requir[ing] participants to certify either that they have met the original standard of being tobacco free or are working towards meeting the original standard of being tobacco free in order to avoid the Tobacco Surcharge." (*Id.* at ¶ 115, #72).

Macy's argues that the Secretary mischaracterizes the Tobacco Affidavit. (Macy's Reply, Doc. 44, #411). The Court agrees. The Tobacco Affidavit requires signatories who have completed the reasonable alternative standard to check a box for either of two options, only one of which involves being tobacco-free or working towards achieving that status. The Tobacco Affidavit does not say that signatories who check the box indicating that they still use tobacco products will have to pay the Tobacco Surcharge, and that is not a plausible inference from the inclusion of such a question in the text of the Tobacco Affidavit alone. For example, Macy's might have included the question about whether Plan participants who completed a reasonable alternative standard still use tobacco products in order to help assess the success of the TSWP, rather than to use the information to impermissibly assess the Tobacco Surcharge against Plan participants who completed a reasonable alternative standard.

To be sure, it may well be the case, as the Secretary alleges, that "not all Health Plan participants who completed a purported reasonable alternative under the TSWP … avoided or were reimbursed the Tobacco Surcharge for the entire Plan year" during the period from Plan Year 2014 to the time of suit. (Am. Compl., Doc. 4, ¶ 116, #73). But the Secretary's mere "information and belief" (*id.*) is an insufficient basis for plausible entitlement to relief arising out of this conclusory statement, which does not provide any "who, what, where, when, how or why." *Total Benefits*, 552 F.3d at 437. And the Secretary provides no further factual detail in support of this allegation apart from the Tobacco Affidavit, which does not support it as discussed above. Thus, the Court concludes that the Secretary has not, at this juncture, properly pled that the TSWP was a discriminatory wellness program in Plan Years 2014 and following. The Court therefore **GRANTS** Macy's Motion (Doc. 37) with respect to those claims.

On the other hand, the Court identifies no fundamental legal defect that would prevent the Secretary from stating a claim with respect to those years, if only he can provide further factual support sufficient to render his claim plausible. Thus, the Court cannot say that it would be futile to allow the Secretary to further amend the Amended Complaint (Doc. 4) with respect to these claims. Therefore, the Court **DISMISSES** the claims for discriminatory wellness program arising out of the TSWP for Plan Years 2014 and following **WITHOUT PREJUDICE**, and **GRANTS** the Secretary leave to amend his Amended Complaint (Doc. 4) to add sufficient factual detail to state a claim with respect to Plan Years 2014 and after, if he can.

**C.      The Secretary's Fiduciary Claims With Respect To The TSWP Fail, But The Secretary Has Leave To Amend With Respect To Plan Years 2014 And Following.**

In addition to his allegations of a discriminatory wellness program under 29 U.S.C. § 1182, the Secretary also alleges that Macy's breached fiduciary duties in connection with the TSWP in violation of 29 U.S.C. §§ 1104 and 1106. To prevail on his claims, the Secretary would first have to establish that Macy's acted as a fiduciary holding assets in trust for its employees, rather than as a settlor modifying the terms of a benefits program, with respect to its conduct of the TSWP at issue in this suit. The Court concludes that Macy's acted as a settlor with respect to the actions at issue in the claims related to the TSWP for Plan Years 2011–2013. But the Court cannot now exclude the possibility that, if the Secretary can sufficiently allege a discriminatory wellness program for Plan Years 2014 and following, he could also allege a breach of fiduciary duty in connection with the TSWP for those years. At this time, the Court need not, and does not, reach other issues disputed by the parties in connection with the fiduciary claims related to the TSWP.

**1.      Macy's Was Acting As A Settlor Rather Than A Fiduciary With Respect To The Claims For Plan Years 2011–2013.**

The parties agree that a threshold question is whether Macy's was acting as a fiduciary or as a settlor in connection with the TSWP conduct at issue in this case. Macy's argues that it was acting as a settlor. The Secretary argues Macy's was acting as a fiduciary. At least with respect to Plan Years 2011–2013, the Court agrees with Macy's.

As the Supreme Court has explained, "[i]n every case charging breach of ERISA fiduciary duty … the threshold question is … whether [the defendant] was acting as a fiduciary … when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). This question arises because ERISA adopts fiduciary duties from the common law of trusts and transplants them to the context of benefits provided by an employer who also, naturally, "may have financial interests adverse to beneficiaries." *Id.* at 225. Thus, the fact that employers sometimes act as fiduciaries with respect to employee benefits does not prevent them from also "tak[ing] actions to the disadvantage of employee beneficiaries, when they act as … plan sponsors (*e.g.*, modifying the terms of a plan as allowed by ERISA to provide less generous benefits)." *Id.* When the employer alters the terms of a plan, the employer is acting as a settlor rather than a fiduciary. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996). After all, ERISA normally does not require the employer to provide particular benefits, nor does it ordinarily prevent the employer from changing the benefits it provides, including in ways that are detrimental to employees. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

Here, Macy's acted as a settlor rather than a fiduciary when it created the TSWP. The decision to charge a Tobacco Surcharge for individuals who neither refrained from using tobacco products nor completed a reasonable alternative was a modification of the terms of the Health Plan "to provide less generous benefits" to those employees. *Cf. Pegram*, 530 U.S. at 225. Indeed, the Secretary does not really

dispute that "the decision to create the Wellness Program may have been a settlor function not subject to ERISA." (Resp. to Macy's, Doc. 41, #362).

Nevertheless, the Secretary argues that the "implementation" of the Wellness Program was a fiduciary function. (*Id.*). More specifically, the Secretary argues that Macy's was a fiduciary with respect to the TSWP because Macy's exercised "discretionary authority or discretionary responsibility in [its] administration." (*Id.* (citing 29 U.S.C. § 1002(21)(A))). But the distinction between creation (a settlor function) and implementation (a fiduciary function) is illusory where the Secretary alleges only that a discriminatory wellness program was implemented as created. The Secretary does not allege that Macy's mismanaged or misappropriated Health Plan assets in connection with the TSWP. Moreover, with respect to Plan Years 2011–2013, the Secretary's factual allegations do not provide any support for his conclusory references to failure to discharge duties in accordance with Plan documents. (*See* Am. Compl., Doc. 4, ¶¶ 97(b), 105(b), 111(b), #65, 68, 70). Indeed, the Secretary's Amended Complaint does not rest its allegations on the management or administration of the TSWP at all. Instead, the Secretary's only apparent allegation about implementation is that Macy's implemented a discriminatory wellness program *in accordance with* the impermissibly discriminatory terms it established when it created the program. This is not enough to make Macy's a fiduciary rather than a settlor with respect to the conduct of which the Secretary complains.

Moreover, the Secretary could not remedy this legal defect merely by pleading more detailed factual allegations. Instead, again, there is a fundamental mismatch

between the Secretary's core factual allegation (that Macy's created and implemented a discriminatory wellness program) and the legal theory he advances (that Macy's breached a fiduciary duty). Put another way, the factual allegations of the Amended Complaint contradict the Secretary's legal claim that Macy's was acting as a fiduciary rather than as a settlor in its acts of creation and implementation of the TSWP at issue in this case for Plan Years 2011–2013. *See Jiangbo Zhou*, 2020 WL 2512865, at *4 (internally inconsistent allegations failed to state claim).

To be sure, there is no reason the same facts that give rise to a claim for a discriminatory wellness program could not, under appropriate circumstances, also give rise to a claim for breach of fiduciary duty. But they could only do so where the threshold requirement of action as a fiduciary, rather than as a settlor, was satisfied. Here, that requirement is not met, and thus the Secretary's fiduciary claims based on the TSWP in Plan Years 2011–2013 fail as a matter of law. Accordingly, the Court **GRANTS** Macy's Motion (Doc. 37) with respect to the fiduciary claims arising out of the TSWP for Plan Years 2011–2013, and **DENIES** the Secretary leave to further amend the Amended Complaint (Doc. 4) with respect to those claims. The Court accordingly **DISMISSES** the Secretary's claims for breach of fiduciary duty arising out of the TSWP for Plan Years 2011–2013 **WITH PREJUDICE**.

## 2. The Secretary May Amend His Allegations That Macy's Breached A Fiduciary Duty Through The TSWP For Plan Years 2014 And Following.

The Court has granted the Secretary leave to amend the underlying factual allegations of a discriminatory wellness program in Plan Years 2014 and following.

Depending on what those allegations might turn out to be, the Secretary's further claims for breach of fiduciary duty could differ in kind from his claims regarding Plan Years 2011–2013. The Court thus cannot in principle rule out at this juncture the possibility that the Secretary could properly plead a breach of fiduciary duty on the basis of more detailed factual allegations regarding Plan Years 2014 and following. Among other things, failure to follow plan documents can under appropriate circumstances give rise to a claim for violation of fiduciary duty. 29 U.S.C. § 1104(a)(1)(D). Thus, an allegation of failure to follow Plan documents with respect to the TSWP could conceivably state a claim of breach of fiduciary duty in Macy's implementation, as distinct from its mere creation, of the TSWP. Rather than further consider such hypothetical claims not before it, the Court errs on the side of freely granting leave to further amend the Amended Complaint (Doc. 4). *See* Fed. R. Civ. P. 15(a)(2). Accordingly, the Court **GRANTS** Macy's Motion (Doc. 37) and **DISMISSES** the Secretary's claims for breach of fiduciary duty with respect to the TSWP for Plan Years 2014 and following, but **WITHOUT PREJUDICE**. The Court **GRANTS** the Secretary leave to amend his claims for breach of fiduciary duty in the Amended Complaint (Doc. 4) in connection with the TSWP for Plan Years 2014 and following.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Cigna's and Anthem's Motions to Dismiss (Docs. 36, 38) in their entirety and **DISMISSES WITH PREJUDICE** all claims against Cigna and Anthem. The Court also **GRANTS IN PART** and **DENIES IN PART** Macy's Motion to Dismiss. (Doc. 37). Specifically, the Court **GRANTS**

Macy's Motion (Doc. 37) as to the claims concerning the out-of-network reimbursement methodology and **DISMISSES** those claims **WITH PREJUDICE**. The Court also **GRANTS** Macy's Motion (Doc. 37) as to the Secretary's fiduciary claims arising out of the TSWP for Plan Years 2011–2013, and **DISMISSES** those claims **WITH PREJUDICE**, but **DENIES** Macy's Motion (Doc. 37) with respect to the Secretary's claims for discriminatory wellness program for Plan Years 2011– 2013. Finally, the Court **GRANTS** Macy's Motion (Doc. 37) with respect to the Secretary's claims for discriminatory wellness program and breach of fiduciary duty regarding the TSWP in Plan Years 2014 and following and **DISMISSES** those claims, but **WITHOUT PREJUDICE**. As to the claims relating to the TSWP in Plan Years 2014 and following, and those claims only, the Court **GRANTS** the Secretary leave to further amend his Amended Complaint (Doc. 4). As to all other claims, the Court **DENIES** leave to amend. The Court **DIRECTS** the Clerk to **TERMINATE** Anthem and Cigna from this action.

**SO ORDERED.**

November 17, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**